Charles MUTHIG and Rhoda Muthig,
Plaintiffs, Appellants,

v.

BRANT POINT NANTUCKET, INC., et
al., Defendants, Appellees.

No. 87–1292.

United States Court of Appeals,
First Circuit.

Heard Oct. 5, 1987.

Decided Feb. 8, 1988.

Opinion on Denial of Rehearing
March 24, 1988.

Robert V. Lizza with whom Sherburne, Powers & Needham, Boston, Mass., was on brief, for plaintiffs, appellants.

Edward Notis–McConarty with whom Kevin M. Brill and Hemenway & Barnes, Boston, Mass., were on brief, for defendant, appellee Donald M. Jordan.

Before CAMPBELL, Chief Judge, TIMBERS,* Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

In 1984, Charles and Rhoda Muthig signed a contract to buy condominium property on Nantucket Island for about $20,-000. After the seller (a property development company) refused to carry out the bargain, the Muthigs brought a diversity action charging the company, one of its owners, and one of its salesmen with breach of contract, fraud, unfair trade practices, and intentional infliction of emotional suffering. Eventually, the Muthigs won their breach of contract and unfair trade practice claims against the company and its owner. But, the district court found their claims against *the salesman* so "unjustified" and plainly "devoid of merit" that he awarded the salesman $18,335 for legal expenses. The Muthigs appeal the fee award. We find the award a lawful sanction under Fed.R.Civ.P. 11.

## I

The appellants' pleadings, affidavits, depositions, and related documents reveal the following basic facts on which their lawsuit rests:

A development company called Brant Point Nantucket, Inc., one of whose owners was William Cameron, built a group of time-sharing condominiums called Brant Point Courtyard. In 1984, the Muthigs signed a purchase and sale agreement for one time-share unit, and they obtained an option to buy additional condominium space. Salesman Donald Jordan signed for the company. On June 29, 1985, the Muthigs arrived on Nantucket, ready to exchange money for deed and to spend a week of vacation in their new condominium. Unfortunately, as they drove to the courtyard, they found that a jeep truck blocked the street. The driver refused to move. The Muthigs say that the driver laughed at them and made an obscene gesture.

The Muthigs then took a different route to the courtyard. When they arrived, they met Jordan, who told them the deed was not yet ready, but that they nonetheless could occupy their unit. They moved in. They started to return to the main office when Brant Point owner William Cameron drove into the courtyard. Lo and behold: Cameron was the very jeep driver who had previously blocked the Muthigs' way.

Cameron, who was less than pleased to see the Muthigs, challenged them with questions, such as 'Who the hell are you, and what are you doing here?" To make a long story short, there was another argument. And, despite Jordan's efforts to calm everyone down and the Muthigs' efforts to call in the local police, Cameron successfully induced the Muthigs to leave, saying (they claim) "get your garbage off my property." Subsequently, Brant Point refused to convey the Muthigs' condominium share, refused to allow them to exercise their options, and refused even to return their deposit. The Muthigs later discovered that Brant Point would not have had the legal ability to convey good title to their property in early July, 1985 had it wished to do so. The title suffered from a technical legal defect. Brant Point had not yet recorded a necessary amendment to the "master deed," and it did not do so until four months later.

The most significant of the many procedural events in the case are the following:

1. In August, 1985, plaintiffs filed a one-count "breach of contract" claim against the development company.

2. In October, 1985, plaintiffs amended the complaint and joined owner Cameron and salesman Jordan as defendants. The amended complaint asserted: (a) breach of

* Of the Second Circuit, sitting by designation.

contract against Brant Point (Counts I and II), (b) fraud against Brant Point, Cameron, and Jordan (Count III), (c) intentional infliction of emotional distress against Cameron and Jordan (Count IV), and (d) unfair trade practices (Mass.Gen.Laws ch. 93A (1984)) against Brant Point (Count V).

3. On February 14, 1986, Jordan moved to dismiss the two counts against him, namely fraud and intentional infliction of emotional distress.

4. One week later, on February 21, 1986, the plaintiffs amended their complaint again, substituting Cameron for the company as a defendant in their unfair trade practice claim in Count V, and adding an unfair trade practice against Jordan (Count VI).

5. On March 19, 1986, the district court denied Jordan's motion for summary judgment. The court wrote:

> While the record shows the plaintiffs' allegations are far-reaching and expansive, they do present factual conflicts which must be resolved by a factfinder, thus precluding dismissal.

6. On July 30, 1986, after further pretrial proceedings, the court referred the case to the Boston Bar Association Mediation Panel in an effort to reach a settlement without a full trial. The court issued an order of transfer on September 2.

7. On September 19, 1986, defendants deposed the Muthigs.

8. On November 4, 1986, the court set the case for trial.

9. On November 20, the parties filed a stipulation of facts, issues to be tried, and a list of witnesses.

10. On November 21, the plaintiffs, Cameron, and the company agreed to submit the dispute to the Bar Association's Mediation Panel for a binding decision. Jordan did not agree. The plaintiffs and Jordan then signed a stipulation that the plaintiffs "voluntarily dismiss with prejudice all claims ... against Donald Jordan," and the plaintiffs filed the stipulation with the court.

11. On January 30, 1987, Jordan moved for attorneys' fees under Fed.R.Civ.P. 11 and under Mass.Gen.Laws ch. 231, § 6F (1984).

12. On February 3, 1987, plaintiffs moved to strike Jordan's motion for attorneys' fees on the ground that the voluntary dismissal deprived the court of the legal power to act on either motion.

13. On March 3, 1987, the Bar Association Mediation Panel issued its decision, finding for the Muthigs on the contract and unfair trade practice claims and for Cameron and the company on the fraud and emotional suffering claims. It also issued a "non-binding recommendation" that "the court award reasonable attorney's fees to Defendant Jordan." The panel said (1) "the evidence clearly and unambiguously showed that Jordan has consistently acted courteously to the plaintiffs and did all in his power to facilitate the sale [to] the Muthigs," and (2) "whatever technically inaccurate statements he might have made" in respect to the title defect "do not form any basis for the plaintiffs' claims against him." The Panel said the Muthigs' claim against Jordan was "wholly insubstantial, frivolous, and not advanced in good faith."

14. On March 9, the court awarded Jordan approximately $18,000 in fees. It wrote:

> Based on the recommendation of the Panel and the record, this was a wholly unjustified action and the defendant need not be subjected to these expenses.

15. On March 19, the plaintiffs moved for reconsideration of the fee award.

16. On March 31, the court denied the motion for reconsideration, stating in part:

> The record is so clear that the claim against Jordan was devoid of merit that counsel's fee award is the only reasonable sanction.

These sixteen major procedural events are part of a six-page docket sheet that lists 121 items, together generating a record of many hundreds of pages. We have read that record. It shows that the dispute was, or should have been, simple and capable of speedy, inexpensive resolution. In resolving the dispute, the Panel and district court held, or wrote, that Cam-

eron should pay the Muthigs, because he injured them; that Jordan should not pay the Muthigs, because he tried to help them, not to hurt them; and that Jordan should not have to pay the $18,335 that the suit has cost him, for he is an innocent bystander, and the Muthigs knew or should have known it. Our reading of the record convinces us that this outcome is fair, and that the $18,335 fee award is lawful.

## II

Jordan based his attorneys' fees request upon two different, independent sources of law, Fed.R.Civ.P. 11 and Mass.Gen.Laws ch. 231, § 6F (1984) (permitting an award of "reasonable counsel fees" incurred in defending a claim that is "insubstantial, frivolous, and not advanced in good faith.") *See Pan American World Airways, Inc. v. Ramos,* 357 F.2d 341 (1st Cir.1966) (federal court in a diversity case may award attorneys' fees under a state statute). The district court's brief statement of reasons for its award and its use of the word "sanction" (a word that appears only in Rule 11) indicate to us that the court invoked both sources of legal authority. As a result, the district court's award is lawful if *either* source offers adequate legal support. Since we find sufficient support in Rule 11, we need not consider the appellants' arguments in respect to the state statute.

■ Rule 11 provides in relevant part that if an attorney files a "pleading, motion, or other paper" without a belief

formed after reasonable inquiry [that] it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation ... the court ... shall impose [upon the attorney, the client, or both] ... an appropriate sanction, which may include an order to pay to the other party ... the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

An appellate court will afford a degree of leeway to a district court in applying this rule, for the district court "has tasted the flavor of the litigation and is in the best position to make these determinations." *Westmoreland v. CBS, Inc.,* 770 F.2d 1168, 1174 (D.C.Cir.1985). With that leeway in mind, we review the appellants' legal arguments challenging the district court's application of Rule 11 in this case.

■ 1. Appellants first make a highly technical legal claim. They dismissed their court action against Jordan voluntarily, under the authority of Fed.R.Civ.P. 41(a), before Jordan asked the district court to impose sanctions. Fed.R.Civ.P. 41(a)(1)(ii) (plaintiff may dismiss "an action ... without order of the court ... by filing a stipulation signed by all relevant parties"). They say that a court loses jurisdiction automatically upon the filing of a voluntary dismissal, *see McCall–Bey v. Franzen,* 777 F.2d 1178 (7th Cir.1985); *Gardiner v. A.H. Robins Co., Inc.,* 747 F.2d 1180 (8th Cir. 1980), and they conclude that, without jurisdiction, the court could not impose sanctions.

This technical argument, however, fails to recognize the protean quality of the word "jurisdiction." *Cf.* Maitland, "The Shallows and Silences of Real Life," 1 *Collected Papers* 467, 478 (1911). That word, at least sometimes, refers to a relation between a court and a specific type of judicial decision then under consideration. Courts that lack jurisdiction with respect to one kind of decision may have it with respect to another. *See Szabo Food Service, Inc. v. Canteen Corp.,* 823 F.2d 1073, 1077–79 (7th Cir.1987). A court, for example, always has jurisdiction to consider its own jurisdiction, *Lane v. United States,* 727 F.2d 18, 21 (1st Cir.), *cert. denied,* 469 U.S. 829, 105 S.Ct. 113, 83 L.Ed.2d 57 (1984), and it has jurisdiction to punish with sanctions any abuse of its process committed during such consideration. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). As the Seventh Circuit recently noted, neither lawyer nor client could escape a sanction by, say, voluntarily dismissing a case just be-

fore committing a contempt. *See Szabo,* 823 F.2d at 1079.

Of course, one might still ask whether the Federal Rules authorize the court to impose a Rule 11 sanction after a Rule 41 voluntary dismissal. Both the Constitution and the Rules Enabling Act, 28 U.S.C. § 2072 (1982), presumably would permit the Rules' framers to authorize such a sanction. The language of Rule 11 suggests that they did so. It employs broad terms, saying that "the court *shall* impose ... sanctions." *Szabo,* 823 F.2d at 1077 (emphasis added). It contains no "post-voluntary dismissal" limitation. Nor does Rule 41 contain any language that requires reading such a limitation into Rule 11. Indeed, Rule 11's use of the word "sanction" suggests a contempt power analogy and thereby suggests that post-dismissal use is appropriate. *Szabo,* 823 F.2d at 1077–79. So does the Advisory Committee's comment that a party normally will move to impose Rule 11 sanctions "at the end of the case." Advisory Committee Note to Rule 11.

Moreover, to read a "post-dismissal" exemption into Rule 11 would obstruct the Rule's purpose of discouraging the assertion of baseless claims and defenses without, in any significant way, furthering any important Rule 41 policy. Finally, the Seventh Circuit, in *Szabo,* analyzing the issue in depth, has reached the same result, and has adequately distinguished arguably contrary Second Circuit authority. *Szabo,* 823 F.2d at 1076 (distinguishing *Santiago v. Victim Services Agency of the Metropolitan Assistance Corp.,* 753 F.2d 219 (2d Cir.1985), which held that plaintiff's voluntary dismissal under Fed.R.Civ.P. 41(a)(1)(i) prevented the district court from finding the defendant a "prevailing party" under a civil rights case attorneys' fees provision (42 U.S.C. § 1988 (1982))); *but see Johnson Chemical Co., Inc. v. Home Care Products, Inc.,* 823 F.2d 28 (2d Cir.1987) (relying upon *Santiago* to hold that a Rule 11 sanction could not be imposed following a Rule 41(a)(1)(i) dismissal). We agree with the Seventh Circuit. *Szabo, supra; accord Kurkowski v. Volcker,* 819 F.2d 201 (8th Cir.1987).

Of course, a party should make a Rule 11 motion within a reasonable time. *See Duane Smelser Roofing Co. v. Armm Consultants, Inc.,* 609 F.Supp. 823 (E.D. Mich.1985) (party cannot move for Rule 11 sanctions after case has been decided on appeal); *cf. Overnite Transportation Co. v. Chicago Industrial Tire Co.,* 697 F.2d 789 (7th Cir.1983) (same result for motion for fees under 28 U.S.C. § 1927 (1982)); Local Rules of the District of Massachusetts, Rule 27 (normally parties file motions for attorneys' fees within 30 days of entry of judgment). But the district court could reason that Jordan met that requirement by filing his Rule 11 motion in January, when the Mediation Panel was still deliberating prior to its March decision and report. The fact that Jordan filed two months after the parties had filed their stipulation of voluntary dismissal did not prejudice the Muthigs or their counsel.

For these reasons, the district court possessed the power to enter a judgment in Jordan's favor for the purpose of assessing counsel fees, *Szabo,* 823 F.2d at 1077–79, even though that judgment may be without legal effect for other purposes. *See Gardiner, supra; cf. McCall–Bey, supra* (district court lacked jurisdiction to enforce settlement agreement once case was dismissed under Rule 41(a)(1)(ii)), *Londono v. City of Gainesville,* 768 F.2d 1223 (11th Cir.1985) (same); *Fairfax Countywide Citizens Association v. Fairfax County,* 571 F.2d 1299 (4th Cir.1978) (same); *but cf. Aro Corp. v. Allied Witan Co.,* 531 F.2d 1368 (6th Cir.) (court has jurisdiction under Fed. R.Civ.P. 60(b)(6) to enforce settlements), *cert. denied,* 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976).

2. Appellants next turn to the merits. Rule 11, insofar as it is relevant here, permits a sanction only if counsel signed a "motion, pleading, or other paper" without "knowledge, information and belief formed after reasonable inquiry" that "it is well grounded in fact and is warranted by existing law...." We must apply an "objective test" of "reasonable inquiry," not considering what counsel may have *actually* be-

lieved, *see* Advisory Committee Note to Rule 11; *Zaldivar v. City of Los Angeles,* 780 F.2d 823, 831 (9th Cir.1986); *Eastway Construction Corp. v. City of New York,* 762 F.2d 243 (2d Cir.1985), and we must give appropriate weight to the district court's greater familiarity with the case, *Westmoreland,* 770 F.2d at 1174.

We also note the absence here of any special factor militating against a stringent application of Rule 11. The Muthigs' counsel is not an understaffed sole practitioner seeking to aid a client who has been hurt by the defendant but who is uncertain about the exact legal vehicle for redress, nor is he trying to make new law. Rather, counsel is associated with a major law firm with all the attendant resources; he has sued a defendant who did not hurt his clients. Having read the record with these standards in mind, we now agree with both the Mediation Panel and the district court: the Muthigs' claims were not "well grounded in fact;" the Muthigs' counsel should have known it; and a Rule 11 sanction that redresses the harm that their suit caused Jordan is legally appropriate.

The record makes obvious that counsel, from the beginning, should have known the factual inadequacy of the Muthigs' claim of intentional infliction of emotional distress. To prevail under Massachusetts law, the Muthigs would have to show, among other things, that Jordan's conduct was "extreme and outrageous," "beyond all possible bounds of decency," and "utterly intolerable in a civilized community." *Agis v. Howard Johnson Co.,* 371 Mass. 140, 145, 355 N.E.2d 315 (1976). We cannot see how the Muthigs' counsel could have expected to show a violation of this standard when both of the Muthigs (in their affidavits filed in March, 1986) described their conversations with Jordan as "polite and congenial" and explained how he tried to help calm the situation. In their depositions (taken on October 23, 1986), Mr. Muthig testified that he found Jordan "polite, amicable," that Jordan apologized for what Cameron had done, and that he never said anything "unpleasant or impolite," while Mrs. Muthig described Jordan as an "absolutely wonderful, lovely, delicious person to deal with;" she described their relationship as one in which they shook hands and kissed hello and goodbye. Every document filed described Jordan as having behaved politely and decently in what was certainly a trying situation. If counsel did not know this when he filed the complaint, he should have made "reasonable inquiry" of the Muthigs, for the record indicates they made no effort to hide it.

The same conclusion in respect to the Muthigs' fraud claim (and the essentially identical unfair trade practices claim) is only slightly less obvious. That claim would have been legally sufficient only if the Muthigs could have shown, factually, that: (1) the title to the condominiums suffered from a legal defect on June 29, 1985; (2) Jordan knew of the defect but misled them; and (3) Jordan's deception harmed them. Without proof of *caused harm,* the claims of fraud and deceptive trade practices were legally meritless. *See Cardullo v. Landau,* 329 Mass. 5, 7, 105 N.E.2d 843 (1952); *Goodwin v. Dick,* 220 Mass. 556, 557–58, 107 N.E. 925 (1915), *cited in Connelly v. Bartlett,* 286 Mass. 311, 315, 190 N.E. 799 (1934).

The first condition is apparently true; there was a technical title defect. The second condition (Jordan's knowledge of the defect) is apparently false, but the Muthigs might reasonably have thought otherwise. The third essential part of the Muthigs' claim (that Jordan caused them injury) is not only false, but "reasonable inquiry" should have led counsel to realize it was false (and that the fraud claims were therefore without foundation) soon after he filed the complaint.

The reason we say this is that the defect in the title was technical; it was soon cured; and it could not have hurt the Muthigs unless they would have left Brant Point due to the knowledge that they could not obtain a valid deed for several months. But, throughout the course of the lawsuit, the Muthigs have claimed that Cameron's temper, not a defect in the title, prevented them from obtaining their property. And, they presented evidence suggesting that a several month delay in obtaining a valid

deed would *not* have led them to leave. In the Muthigs' March 1986 opposition to Jordan's motion to dismiss, counsel wrote that Jordan had told them that they might not get a deed for some time (because the Nantucket registry of deeds was "backed up"); yet, the Muthigs evidently still intended at that time to stay if they could. All of this is to say that, in the context of the case, the fraud claim against Jordan was a red herring. The Muthigs had no evidence of injury caused by any fraudulent behavior by Jordan; there is no reason to think that they ever believed the fraud did cause them injury; and their basic explanation of how they were hurt suggests that any "deception" did *not* hurt them.

Even though questioning by counsel of his clients might have revealed the problem with the fraud claim before the Muthigs sued Jordan, we are not prepared to say that he violated Rule 11 at the time he added Counts III and VI to the complaint. He may have suspected some relation between the title defect and harm to his client; he may not have understood Jordan's role with respect to the defect; he may have thought the defect was serious or permanent. We do think, however, that counsel should have known that the fraud claim was baseless by March, 1986, when he reiterated the claim in his opposition to Jordan's motion to dismiss. By then he knew (after deposing Cameron on December 19, 1985) that the title defect had been cured "in the fall of 1985". By then he had received a letter from Jordan's counsel (dated November 27, 1985) pointing out that Jordan had been willing to let the Muthigs take possession of their condominium, deed or no deed, and that any "deception" (inadvertent or intentional) about the state of the title could not have hurt the Muthigs. (We have attached the November 27 letter, and the Muthigs' demand letter to which it responded, as an appendix to this opinion because it presents a good example of the kind of clear, simple statement that should have led counsel to examine his claim more closely.)

■ With respect to the emotional suffering claim, then, counsel's signature on the complaint violated Rule 11; with respect to the other claims against Jordan, counsel's signature on the opposition to Jordan's dismissal motion violated Rule 11. His signature on the pretrial order, in November, 1986, asserting triable issues with respect to Jordan's "extreme and outrageous" conduct and Jordan's "misrepresentation" that caused "the Muthigs' distress" also violated Rule 11. All but about $3,000 of Jordan's counsel fees were incurred after the Muthigs' counsel filed his opposition, and all but about $500 of Jordan's counsel fees were incurred after the close of 1985 (by which time counsel should have known that all of his claims against Jordan were baseless). Given the small amount of costs that one might apportion to any pre–1986 defense of the fraud claim, we see no need for apportionment, and the district court's award of the entire $18,335 as a sanction covering *all* of Jordan's legal costs was lawful.

■ 3. Appellants argue that the district court could not find a violation of Rule 11 because it denied Jordan's summary judgment motion. That fact, they say, indicates conclusively that it was reasonable to pursue their claims against him. *Cf.* Note, *Plausible Pleadings: Developing Standards for Rule 11 Sanctions*, 100 Harv.L. Rev. 630, 650 (1987). The correctness of the district court's summary judgment is not before us. Nor do we see the summary judgment standard (based on filed documents) and Rule 11's standard (based on what reasonable inquiry should have revealed, perhaps about *other* information) as necessarily or inevitably congruent. Regardless, the district court did not have before it, at the time, the Muthigs' depositions describing Jordan's behavior. The documents before the court might have suggested the existence of a factual dispute that the later depositions revealed (and counsel should have known) were illusory.

■ 4. We note that the district court imposed sanctions without a full prior hearing. Rule 11 does not require a hearing in this case. The Rules Advisory Committee says that the Rule 11 procedural format

"should depend on the circumstances of the situation." Advisory Committee Note to Rule 11. Jordan filed a motion asking for Rule 11 sanctions, thereby giving the appellants adequate notice. The briefing process allowed them and their counsel opportunity to present evidence and argument. *See Donaldson v. Clark*, 819 F.2d 1551, 1559–61 (11th Cir.1987) (notice and opportunity to present arguments before imposition of Rule 11 sanctions comports with due process protections contained in Rule 11 and in the Constitution). Counsel did not, and does not, point to any controverted factual matter that might have called for additional procedure.

We also note that the Rules Advisory Committee has warned against overly elaborate procedural requirements, which the Committee feared might make courts reluctant to compensate, through cost-shifting, the victims of a groundless claim or defense. *See* Miller, *The Adversary System: Dinosaur or Phoenix*, 69 Minn.L.Rev. 1, 26–27 n. 91 (1984) (*and* citations therein); Note, *Plausible Pleadings: Developing Standards for Rule 11 Sanctions*, 100 Harv.L.Rev. 630, 636 (1987); Note, *The Dynamics of Rule 11: Preventing Frivolous Litigation by Demanding Professional Responsibility*, 61 N.Y.U.L.Rev. 300, 329 (1986). The Advisory Committee wrote:

> To assure that the advantages achieved through more effective operation of the pleadings regimen will not be offset by the cost of satellite litigation over the imposition of sanctions, the court must to the extent possible limit the scope of the sanction proceedings to the record.

We see nothing improper about basing the sanction in this case on the record alone.

### III

■ Two matters remain. First, Jordan has requested counsel fees and costs for defending this appeal, and we grant that request. In doing so, we do not mean to imply that the appeal is frivolous or brought in bad faith, for that is not so. In bringing it, appellants have not filed any papers with the appellate court that violate Rule 11. Rather, we award appellate counsel fees because Rule 11 specifically says that an "appropriate sanction ... may include an order to pay ... the amount of the reasonable expenses *incurred because of* the filing of the pleading, motion, or other paper" that violated Rule 11. Fed.R.Civ.P. 11 (emphasis added). As the District of Columbia Circuit has pointed out, a party who successfully defends a Rule 11 appeal incurs appellate expenses (including attorneys' fees) "because of" the Rule 11 violation. *See Westmoreland*, 770 F.2d at 1279. Whether one sees Rule 11 as primarily a fee-shifting measure, *see* Miller, *The Adversary System: Dinosaur or Phoenix*, 69 Minn.L.Rev. 1, 26–27 n. 91 (1984) (*and* citations therein); Note, *Plausible Pleadings: Developing Standards for Rule 11 Sanctions*, 100 Harv.L.Rev. 630, 636 (1987); Note, *The Dynamics of Rule 11: Preventing Frivolous Litigation by Demanding Professional Responsibility*, 61 N.Y.U.L. Rev. 300, 329 (1986), or primarily a tool to police the profession, *see, e.g., In re Itel Securities Litigation*, 596 F.Supp. 226, 235 (N.D.Cal.1984), *aff'd*, 791 F.2d 672 (9th Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987), its purposes suggest that an award of appellate counsel fees here is appropriate.

■ Second, the district court did not specify whether the Muthigs or their counsel should pay the counsel fees assessed. Our reading of the record indicates that the sanction should be imposed upon counsel. The Muthigs fully described their good relations with Jordan; there is no reason to think that they (as non-lawyers) would reasonably understand whether, or why, a fraud charge should be brought against him. There is no indication that they encouraged counsel to sue Jordan as well as Cameron against counsel's will or advice.

Counsel has said that he did no more than vigorously pursue his clients' interests. He points out that "all litigation, by its nature, is inconvenient and harassing to the parties involved." Rule 11, however, makes clear that counsel also has a potentially conflicting obligation to the court, and to the system of justice, to prevent the litigation itself from inflicting needless in-

jury through the assertion of a groundless claim or defense, an obligation to do so by making "reasonable inquiry" before making the assertion. The record makes clear to us that this is neither an ordinary case of vigorous representation, nor is it a case of a litigating David matched against a defending Goliath. Rather, it is a case in which the assertion of invalid claims, the invalidity of which "reasonable inquiry" would have revealed, inflicted $18,000 worth of harm upon a real estate salesman (a sum, by the way, nearly equal to what the Muthigs paid for the condominium).

For these reasons, we find the sanction was appropriate and lawful. The judgment of the district court is

*Affirmed.*

## APPENDIX

October 23, 1985

CERTIFIED MAIL—RETURN
  RECEIPT REQUESTED

Mr. Donald Jordan
Brandt Point Courtyard
Swain Street
Nantucket, MA 02554
Re: *Purchase and Sale Agreement with
    Charles and Rhoda Muthig*

Dear Mr. Jordan:

As you know, this office represents Mr. and Mrs. Charles Muthig of 555 North Street, Fort Lee, New Jersey. I am informed by Attorney James Stinson, counsel to Brandt Point Nantucket, Inc., that you have asserted that you are not an employee of Brandt Point. You claim to be an independent contractor. If so, you may be independently engaged in trade or commerce and subject to the Consumer Protection Act individually. Accordingly, this letter is a formal demand upon you individually made on behalf of the Muthigs, pursuant to Massachusetts General Laws, Chapter 93A, the Consumer Protection Act.

We are informed by the Muthigs that on or about July 2, 1984, Brandt Point Nantucket, Inc. and the Muthigs executed a Purchase and Sale Agreement whereby Brandt Point Nantucket, Inc. agreed to sell, and the Muthigs agreed to buy at a price of Twenty Thousand ($20,000) Dollars, an interval share in the two-bedroom townhouse unit in Building A (A–6) of Brandt Point Courtyard for the one (1) week period commencing on the 25th Saturday of the year. During the 1985 calendar year, the 25th week ran from June 29, 1985 through July 6, 1985. Also, on or about July 2, 1984, the Muthigs tendered to Brandt Point Nantucket, Inc. a check in the amount of One Thousand Nine Hundred Ninety–Five ($1,995) Dollars as a deposit on their interval unit. At the time of the execution of the Purchase and Sale Agreement, Brandt Point Courtyard Building "A" was not yet complete. Under the terms of the Purchase and Sale Agreement, the closing was to take place on or before June 1, 1985. According to the Muthigs, the only person from Brandt Point Nantucket, Inc. with whom they dealt was you as sales representative.

At the time the Muthigs tendered the deposit check to Brandt Point, they were told by you that one of the units in building "A" would be used as an office and then sold after all the other units were sold. Mr. Muthig inquired as to when the "office units" would be sold and whether they could be purchased immediately at the present price for a comparably sized unit.

You responded that you would get back to the Muthigs with a response to their inquiry. Several weeks later the Muthigs received from you a letter offering the Muthigs the first opportunity to purchase the office unit when available but at the 1984 price.

In May, 1985, the Muthigs received a letter from Brandt Point informing them that the closing would take place on Nantucket on June 1, 1985. During the last week of May, Mr. Muthig telephoned you and asked whether he had to come to Nantucket on June 1, or if it would be possible to close upon arrival for their interval weeks. He was told by you in response that they should not make a trip to Nantucket just for the closing, and that they could pass papers on their unit at the time they were to arrive at Brandt Point Courtyard to start their unit interval week on June 29, 1985.

These representations clearly amount to an oral extension of the closing date on the Purchase and Sale Agreement to at least June 29, 1985. Attorney Stinson has admitted this fact to be true in the Answer filed in United States District Court.

On June 29, 1985, the Muthigs flew to Nantucket, ready, willing and able to con-

summate the real estate transaction with Brandt Point Nantucket, Inc. As you know, they were not able to do so because Brandt Point Nantucket, Inc. wrongfully refused to complete the transaction at the time.

When the Muthigs arrived at Brandt Point Courtyard, they met with you and you conducted yourself in all respects as though the Muthigs were to take possession of their interval unit. The Muthigs and you discussed various aspects of the transaction, including adjustments to the purchase price which you wrote on a sheet of scratch paper, and walked through the unit which they were to purchase. In addition, the Muthigs and you discussed various other aspects of the Brandt Point Courtyard development and the closing, which, they were informed by you, was to take place on Monday, July 1, 1985, due to the fact that it was a Saturday and your attorney was off island.

As you know, at some point during the Muthig's meeting with you, Mr. William Cameron, a principal of Brandt Point Nantucket, Inc., arrived at Brandt Point Courtyard and recognized the Muthigs as persons with whom he had just been involved in a traffic incident. A heated exchange of words occurred. After Mr. Cameron departed, you suggested that the Muthigs go shopping for an hour or so, and that when they returned their unit would be ready for them.

When the Muthigs returned, you were nowhere to be found because Mr. Cameron had "ordered" you to go to the downtown office. Mr. Cameron told the Muthigs that they had forfeited their rights under the Purchase and Sale Agreement. He ordered that they leave the premises. Mr. Cameron later represented to the Muthigs and to me that he has no intention of completing the sale of the unit to the Muthigs or returning their deposit.

In our opinion, the facts the Muthigs have related to us show that, based upon your representations, the closing date on the Purchase and Sale Agreement had been extended to and including the day the Muthigs were to begin their interval unit, Saturday, June 29, 1985. As stated earlier, the attorney for Brandt Point Nantucket, Inc. has admitted this to be so. These representations were followed by your conduct which showed you were obviously expecting that the Muthigs would take possession of their unit on June 29, 1985. Moreover, you stated the closing would take place on Monday, July 1, 1985, when the corporation's lawyer returned to Nantucket. It was not until Mr. Cameron came onto the scene that the Muthigs were told that they would not be able to close on the unit because they had forfeited. Based on the facts and circumstances of which we are aware, it is clear that Mr. Cameron's decision was based upon the traffic incident and resulting exchanges of words with the Muthigs, matters totally unrelated to the Muthigs' rights under their Purchase and Sale Agreement. Moreover, it seems reasonable to suspect that the substantial increase in price of the unit over the past year may have influenced Brandt Point Nantucket, Inc. in its decision not to consummate the transaction with the Muthigs. According to the Muthigs, their interval unit for that holiday week now sells for Thirty Two Thousand Five Hundred ($32,-500) Dollars, Twelve Thousand Five Hundred ($12,500) Dollars more than their price. Also, the Muthigs have been unable to exercise their right to purchase the "office unit" interval at the 1984 price as set forth in your letter.

In addition, there appears to have been a serious omission by Brandt Point Nantucket, Inc. regarding the recording of amendments to the condominium Master Deed at the Nantucket Registry. Our title search of the property shows that the amendments to the Master Deed reflecting the changes to Building A were never recorded. In effect, the condominium interval unit purportedly referenced in the Muthigs' Purchase and Sale Agreement and all other such documents and related sales and promotional materials, legally did not exist.

Obviously, Brandt Point Nantucket, Inc.'s failure to convey the unit to the Muthigs is a breach of contract entitling the Muthigs to seek damages to restore to them the benefit of their bargain, plus out-of-pocket expenses incurred when they had to find accommodations elsewhere during their week's vacation on Nantucket. As you know, suit has been filed on this breach of contract claim in the United States District Court in Boston. You have or will soon be made a party defendant to

that action based upon claims of fraud and intentional infliction of emotional distress.

In addition, your conduct amounts to a violation of Massachusetts General Laws, Chapter 93A, the Consumer Protection Act, which prohibits "unfair and deceptive trade practices in the conduct of any trade or commerce."

In particular, without limitation, you have committed the following unfair and deception acts against the Muthigs:

* inducing the Muthigs to come to Nantucket to close on the Purchase and Sale Agreement with knowledge that the unit which was the subject of the Purchase and Sale Agreement did not legally exist and could not be conveyed to the Muthigs.

* representing to the Muthigs that Unit A–6 was a legally existing condominium unit when in fact it was not.

* representing to the Muthigs that due to the nature of a time share unit they would not get a deed or a copy of a deed in return for their payment of the purchase price when in fact you knew or should have known that a buyer of a time share does get a deed and that the reason the Muthigs would not get a deed was because Unit A–6 did not legally exist.

* wrongfully refusing to convey unit A–6 to the Muthigs on the pretextural reason that the Muthigs had forfeited under the terms of the Purchase and Sale Agreement when in fact the real reason was that Mr. Cameron was angry at the Muthigs over an unrelated traffic incident.

* acting so as to defeat the Muthig's rights pursuant to their option to purchase an office unit interval.

Your conduct described herein violates common law, statutory and other established concepts of unfairness, is immoral, unethical, oppressive and unscrupulous, and has caused substantial injury to the Muthigs as consumers. In addition to being denied the benefit of their bargain under the terms of the Purchase and Sale Agreement, the Muthigs have incurred substantial out-of-pocket expenses related to the alternate accommodations they had to purchase in Nantucket during their week's vacation. They have been subjected to outrageous and humiliating behavior by you

and Mr. Cameron, and have suffered severe emotional distress as a result.

In light of the above discussion, pursuant to Massachusetts General Laws Chapter 93A, the Muthigs hereby demand from you:

1. Fourteen Thousand Five Hundred ($14,500.00) Dollars to compensate them for the loss of the benefit of their bargain evidenced by the increase market value of the condominium interval over the purchase price (Twelve Thousand Five Hundred [$12,500] Dollars), and the return of the Two Thousand ($2,000) Dollar deposit; plus

2. A sum equal to the difference in the 1984 price of an "office unit" interval and the 1985 price of the same interval as compensation for the loss of the option; plus

3. One Thousand Nine Hundred Twenty and 52/100 ($1,920.52) Dollars, representing reimbursement for the out-of-pocket expenses they incurred when they were induced by you to come to Nantucket to close but were forced to seek accommodations elsewhere on Nantucket for their week's vacation; plus

4. Twenty Five Thousand ($25,000) Dollars as compensation for the mental anguish, emotional distress, and humiliation they have suffered as a result of your intentional and/or reckless behavior and that of the principals of Brandt Point Nantucket, Inc.; and

5. Reasonable attorney's fees in the amount of Five Thousand ($5,000.00) Dollars.

Under General Law Chapter 93A, you have thirty (30) days to make a reasonable settlement offer in response to the Muthigs demand herein. Failure to make such a response within thirty (30) days could result in the eventual award of treble damages plus reasonable attorney's fees to the Muthigs should they prevail at trial in this matter. Please be advised that unless this matter is resolved within the next thirty (30) days, the Muthigs intend to amend their existing Federal complaint to include a count for violation of Chapter 93A against you, individually.

Very truly yours,
/s/ Robert V. Lizza
Robert V. Lizza

RVL:sj

cc: Mr. and Mrs. Charles Muthig
    Theodore L. Tillotson, Esquire

\* \* \*

November 27, 1985

Robert V. Lizza, Esquire
Sherburn, Powers & Needham
One Beacon Street
Boston, Massachusetts 02108

Re: *Donald Jordan*

Dear Mr. Lizza:

Mr. Jordan has asked me to respond on his behalf to your letter which he received on October 28. I understand that you represent Mr. and Mrs. Muthig in connection with their attempt to purchase a unit at Brandt Point Courtyard. There are many factual claims in your letter with which Mr. Jordan can't agree. There is no purpose to discussing all the specifics in this letter. However, there are some thoughts I'd like to share with you.

Your letter does not reveal any basis for a claim by the Muthigs against Mr. Jordan. The Muthigs claim that they were deprived of an opportunity to purchase the unit at Brandt Point Courtyard because of a disagreement over a traffic incident with Mr. Cameron (a principal of Brandt Point Nantucket, Inc.). However, Mr. Jordan is not and never has been a principal of Brandt Point. It was Brandt Point, not Mr. Jordan, which owned the unit the Muthigs sought to purchase. Mr. Jordan had no power to convey the unit to the Muthigs, and did nothing to interfere with the conveyance. Even if Brandt Point refused to convey the unit, I am at a loss to understand how Mr. Jordan can be held responsible. Mr. Jordan was not, of course, involved in the unfortunate traffic incident, and bears no ill will toward the Muthigs.

On the contrary, Mr. Jordan did his best to be cordial and helpful to the Muthigs, even *after* their disagreement with Mr. Cameron. Your letter contains no facts to the contrary. I cannot guess from your letter why you claim Mr. Jordan's conduct was "unfair, immoral, unethical, oppressive and unscrupulous", but if there are additional facts which you have not mentioned in your letter, we would certainly appreciate knowing of them.

You claim in your letter that there was a defect in the title to the unit the Muthigs sought to purchase, but you don't explain why you think Mr. Jordan is responsible in any way. In fact Mr. Jordan, who did not own the unit in question, relied in good faith on information he received from the owners of Brandt Point. Mr. Jordan passed along to the Muthigs the best information he had.

I understand that the Muthigs are upset with Mr. Cameron's conduct. However, neither you nor your clients should let hostility toward Mr. Cameron cloud the fact that Mr. Jordan has done nothing wrong and certainly has not done anything that injured the Muthigs. If the Muthigs have been upset by anything Mr. Jordan has done, Mr. Jordan extends his deepest apologies.

I trust that, upon reflection, you will agree that the Muthigs have not been injured by Mr. Jordan, and that you will proceed no further. As you know, if you do start a formal action against Mr. Jordan, he will have to defend the action, no matter how little merit the action may have, and he will incur expenses. Where there is no serious claim that the Muthigs were injured by Mr. Jordan, he will have to look to the Muthigs for any expenses he has as a result of further proceedings.

Thank you for your consideration of the above.

> Truly yours,
> /s/ Edward Notis–McConarty
> Edward Notis–McConarty

ENM/grn

## MEMORANDUM AND ORDER

If petitioner is arguing that defendant Jordan's "fraud" may have consisted of a statement to Cameron that the Muthigs did not show him a check, the court believes this is a new theory argued for the first time in the petition for rehearing. We do not read the references cited in the Rule 11 proceeding or petitioner's earlier brief in this court as intelligibly presenting such a theory. Regardless, the question is not whether it was presented in the Rule 11 proceeding or later; the question is whether it was presented as a claim on the merits to the district court in a form in which Jordan would have had an opportunity to understand it, to refute it, and to show that it, too, was possibly frivolous. The record in the case convinces us that petitioner's fraud claim, throughout, was a claim based on a defective deed, not a claim that, in any significant way, was based on a statement to Cameron about the check.

Neither do we find any important conflict in the courts of appeals in respect to the Fed.R.Civ.P. 41(a)(1) issue. Most of the claimed conflict involves dicta, and, where it does not, the arguably "conflicting" courts do not discuss the legal issue in any depth. All this we discussed in our opinion. Nor can we find a significant difference between Rule 41(a)(1)(i) and (a)(1)(ii) in the particular circumstances of this case where Jordan gave notice that he would seek attorneys' fees and made no formal, *explicit* later statement to the contrary.

The petition for rehearing is denied.