**BUSINESS GUIDES, INC.,**
**Plaintiff–Appellant,**

v.

**CHROMATIC COMMUNICATIONS ENTERPRISES, INC.; Michael Shipp, Defendants–Appellees.**

No. 88–15240.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 26, 1989.

Decided Dec. 21, 1989.

---

Stephen V. Bomse, San Francisco, Cal. for plaintiff-appellant.

Neil L. Shapiro, Cooper, White & Cooper, San Francisco, Cal., for defendants-appellees.

Before WALLACE, POOLE and HALL, Circuit Judges.

WALLACE, Circuit Judge:

Business Guides, Inc. (Business Guides) appeals from an order imposing Rule 11 sanctions in its copyright action against Chromatic Communications Enterprises, Inc. (Chromatic) and Shipp, Chromatic's president. Business Guides argues that the district court (1) erred in applying to Business Guides, a represented party, an *objective* standard of "reasonable inquiry" into the factual basis of papers submitted to court, Fed.R.Civ.P. 11; (2) erred in determining that Business Guides failed to conduct such a reasonable inquiry; and (3) abused its discretion in dismissing Business Guides's action as part of the sanction imposed. In addition, Chromatic urges us to invoke Rule 11 to require Business Guides to reimburse Chromatic for its costs of defending this appeal. The district court had jurisdiction pursuant to 28 U.S.C. § 1338(a). We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, vacate in part, and remand.

I

Business Guides is a subsidiary of Lebhar–Friedman, Inc., a leading publisher of trade journals and magazines in the United States. Business Guides publishes 18 different directories for specialized areas of retail trade. Since 1983, Business Guides has published a directory for computer products and services. This action was based on allegations that Chromatic copied the 1984 edition of Business Guides's computer products and services directory (Directory).

■ To protect itself against copyright infringement by competitors, Business Guides intentionally plants incorrect information, known in the industry as "seeds," throughout its directories. Business Guides uses two types of seeds. "Type A" seeds are wholly fictitious entries, i.e. businesses which do not exist. "Type B" seeds are partially altered listings, containing minor errors such as transposed numbers in an address or misspelled names. The appearance of one or more seeds in a competitor's publication is strong evidence that copyrighted material has been appropriated.

Business Guides maintains a "master seed list" for each directory it publishes. Normally this master list, which identifies Type A and B seeds separately, is prepared before publication and its seeds are inserted just before the final printing. In preparing its 1984 master list, however, Business Guides did not follow its usual practice. First, the 1984 master list was prepared almost seven months *after* the publication of the Directory. More importantly for our purposes, Business Guides employed a flawed method of compiling the 1984 master list. This flawed method spurred this lawsuit and, ultimately, produced the Rule 11 sanctions now before us.

Because of a concern that the Directory contained insufficient Type A seeds to substantiate copying, Business Guides directed Burdick, one of its employees, to locate examples of a new form of Type B seed. The new kind of Type B seed would consist of unintentional typographical errors which had shown up in the final version of the Directory. To locate such errors, Burdick compared the final Directory against initial questionnaires used by Business Guides to gather information from the listed companies. The questionnaires are prepared by Lambe, the Director of Research for Business Guides. When Burdick found a disparity between the information listed in the questionnaires and the final Directory, she recorded this on the master list as a Type B seed. This method, however, erroneously assumed that the information on the questionnaires was correct. In fact, information on the questionnaires was frequently revised by Business Guides employees in the proofreading stage. Thus, the 1984 master list of purported errors contained numerous Type B seeds which were factually accurate. The presence of similar listings in competitors' directories would therefore indicate accurate research rather than any copyright infringement of Business Guides's directory.

On October 31, 1986, Business Guides filed a complaint against Chromatic and Shipp, alleging copyright infringement, conversion, and unfair competition. Chromatic publishes a competing directory of computer software dealers. Business Guides sought, among other prayers, a temporary restraining order (TRO) to prevent Chromatic from displaying its directory at an upcoming important trade show. Business Guides's counsel was the law firm of Finley, Kumble, Wagner, Heine, Unterberg, Manley, Myerson & Casey (Finley Kumble).

Business Guides's complaint identified ten seeds in Chromatic's directory which allegedly had been copied. In support of its application for a TRO, Business Guides submitted various affidavits prepared by Finley Kumble. Among these was the affidavit of Burdick, which identified the ten seeds but did not specify what was incorrect about them. The district court allowed the affidavits to be filed under seal, accepting Business Guides's contention that if the information contained in the affidavits were revealed to the public, Business Guides's ability to catch copyright violators would be impaired.

A hearing on the TRO was scheduled for November 7, 1986. Three days before the hearing, the district judge's law clerk telephoned Finley Kumble and requested more specific information regarding the ten seeds. The law clerk asked Finley Kumble to specify what was incorrect about each entry. Finley Kumble then contacted Lambe and requested this additional information. This was apparently the first time Finley Kumble asked for details about the ten "seeds."

Lambe reviewed the 1984 master list and provided Finley Kumble with the requested details. Lambe did not attempt to verify the information by calling the companies listed. Nor did he attempt to obtain the original questionnaires, since they were located in a warehouse in New York and the hearing was only three days away. Lambe did, however, check the accuracy of the seeds' information against subsequent editions of Business Guides's directory. He also checked the zip codes of the listings by consulting a zip code directory. As a result of his investigation, Lambe determined that either three or four of the ten seeds (the record is not clear) in fact contained *correct* information. After Lambe relayed this information to Finley Kumble, the latter informed the court that Business Guides was retracting its claim of copying as to three of the ten seeds. In addition to retracting the three seeds, Finley Kumble provided the court with the requested specific information regarding the remaining seven seeds.

Concerned about the accuracy of the remaining seeds in light of (1) the retractions and (2) Chromatic's perceived apparent inability to respond to the allegations in the sealed affidavits, the district court law clerk took steps to verify the remaining seeds. By spending approximately one hour telephoning the companies reflected in the remaining seeds, the clerk determined that all but one of the seeds actually contained correct information.

Finley Kumble submitted supplemental materials to the court on November 7, including a supplemental affidavit of Lambe, prepared by the firm, reflecting the additional information uncovered in Lambe's investigation. Finley Kumble presented Lambe's declaration to him on the morning of the November 7 hearing. Lambe had several hours to review his affidavit. He made one correction, crossing out mention of a fourth seed which he had determined did reflect accurate information but which Finley Kumble had not retracted. Lambe then executed the affidavit.

On November 7, the court, in light of the inaccuracies in Business Guides's papers, denied Business Guides's application for a TRO, stayed further proceedings (including discovery), and referred the matter to a magistrate for a determination of whether Rule 11 sanctions should be imposed on Finley Kumble or Business Guides.

The district court summarized the subsequent sanction proceedings before the magistrate as follows:

> The Chief Magistrate conducted two evidentiary hearings, one in December 1986 and one in January 1987. The first hearing was ordered to determine whether plaintiff's counsel Finley Kumble should be sanctioned pursuant to Fed.R. Civ.P. 11. The second hearing was ordered to determine whether Business Guides itself should be subject to sanctions pursuant to Fed.R.Civ.P. 11. At both hearings the parties were represented by Mr. Ephraim Margolin ("Margolin"), a local San Francisco defense attorney.
>
> On April 3, 1987, Chief Magistrate Woelfen recommended that sanctions be imposed against both Business Guides and Finley Kumble. The Chief Magistrate recommended that Business Guides, but not Finley Kumble, be held responsible for filing the inaccurate TRO papers. The Chief Magistrate further recommended that both Business Guides and Finley Kumble be sanctioned for their conduct in defending the sanctions proceedings. The Chief Magistrate doubted the good faith of the parties' representations that the factual errors in the affidavit were attributable to coincidences....

The parties, represented by new and separate counsel, filed objections to the April 3 report. Business Guides based its objection on its allegation that new evidence, not previously presented to the Chief Magistrate, was fundamental to a correct understanding of the circumstances of this case. This court did not rule on the objections, but referred the matter back to the Chief Magistrate for a hearing on the new evidence and potential reconsideration of his recommendations.

The Chief Magistrate conducted a third evidentiary hearing on July 9, 1987. Representatives from Business Guides and Finley Kumble were present as well as their respective new counsel.

*Business Guides v. Chromatic Communications, Inc.,* 119 F.R.D. 685, 687 (D.C. Cal.1988) (*Business Guides I*). The new information presented to the magistrate at the July 9 hearing was simply a full explanation, for the first time, of why the "seeds" had in fact contained accurate information. At the two earlier hearings, Business Guides had not discovered, and so could not explain, the faulty method used to compile the 1984 master seed list. Instead, Business Guides had implausibly argued that the accuracy of the allegedly inaccurate information was coincidental. *Id.* at 689.

Based on the third evidentiary hearing, the magistrate, on September 14, 1987,

issued a revised report and recommendation regarding sanctions.

In this report, the Chief Magistrate agreed with Business Guides that the evidence not previously before him was fundamental to a correct understanding of the case. The Chief Magistrate found that the new explanation for the occurrence of inaccuracies, the one the parties presented at the third evidentiary hearing, was reasonable. The Chief Magistrate stated that he no longer believed that either Business Guides or its counsel took part in any intentional misrepresentation or cover-up. The Chief Magistrate did, however, recommend that sanctions be imposed against both parties for their conduct.

The Chief Magistrate found sanctions appropriate against Business Guides because "they failed to conduct a proper inquiry, resulting in the presentation of unreasonable and false information to the court." The Chief Magistrate found that Business Guides used materials they knew or should have known were unreliable for the purpose of creating evidence of copyright infringement.

The Chief Magistrate found that sanctions were not appropriate against Finley Kumble in connection with the initial filing of the TRO application. The Chief Magistrate instead faulted Finley Kumble (along with Business Guides) for its action a few days after the initial papers were filed. The Chief Magistrate found that both Business Guides and Finley Kumble were put on notice that the court was conducting further inquiry into the factual allegations contained in their TRO papers. In response to an inquiry of the court, one of Finley Kumble's attorneys discovered and removed some of the false material in the affidavit. The Chief Magistrate found that at this point both parties had an obligation to conduct further inquiry into the accuracy of all the remaining material in the affidavit. This the parties failed to do.

The Chief Magistrate also recommended that sanctions be imposed against both parties for their conduct in the defense of the sanctions proceedings. The Magistrate determined that no reasonable person would have been satisfied with the [initial] explanations the parties offered with regard to the inaccuracies present in their papers.

*Id.* at 687–88 (citation omitted).

Business Guides and Finley Kumble filed objections to the magistrate's revised report, arguing that Rule 11 sanctions were inappropriate under the circumstances. The district judge rejected these objections and adopted the magistrate's findings of fact and recommendations. *Id.* at 688, 691.

The district judge agreed with the magistrate that (1) Business Guides violated Rule 11 in filing the TRO application; (2) Busi-

ness Guides and Finley Kumble violated Rule 11 by failing, after the initial filing of the TRO, to conduct a reasonable inquiry into the facts even though they were put on notice of inaccuracies; and (3) Business Guides and Finley Kumble violated Rule 11 at the first two sanction hearings before the magistrate. *Id.* at 689. The district court rejected Business Guides's argument that oral representations, such as those made to the magistrate at the first two hearings, cannot be the basis for Rule 11 sanctions. *Id.* at 690. Thus, the district court adopted three separate bases for finding a violation of Rule 11. Finally, the district judge unsealed the record and stayed imposition of the sanctions for thirty days, apparently in order to allow Chromatic to request particular sanctions. *Id.* at 691.

Chromatic then filed a motion for sanctions, which Business Guides opposed. In a decision issued August 5, 1988, the district court ruled on the motion. *Business Guides, Inc. v. Chromatic Communications Enterprises,* 121 F.R.D. 402 (N.D. Cal.1988) (*Business Guides II*). By the time this decision was issued, Finley Kumble had filed for bankruptcy, and Chromatic had withdrawn the part of its Rule 11 motion which applied to the law firm. The district court accepted this withdrawal and issued its ruling without prejudice to Chromatic's right to "pursue a sanctions award against Finley Kumble should its legal status change." *Id.* at 403; *see also id.* at 405. Thus, whether Finley Kumble violated Rule 11 did not figure in the district court's ultimate decision and is not an issue on appeal.

The district court also made further factual findings regarding the one remaining allegedly accurate seed, concluding on the basis of Chromatic's evidence that Chromatic did not copy this seed. *See id.* at 403–04. In addition, the district court rejected Business Guides's argument that it was in fact being sanctioned for the preparation of its master seed list in 1984, and that Rule 11 did not cover such conduct. *Id.* at 404.

Having reaffirmed its decision to impose Rule 11 sanctions, the district court next considered what sanctions to impose upon Business Guides. The court first imposed a sanction of $13,865.66 for Chromatic's legal expenses incurred in defending against the frivolous action and in bringing the motion for sanctions. *Id.* at 405. The court then considered, but refused to award, monetary sanctions based upon Chromatic's alleged "business losses" suffered as a consequence of the lawsuit. *Id.* at 405–06. Next, though acknowledging that it was a "severe sanction," the district court ordered dismissal with prejudice of Business Guides's action. *Id.* at 406. The court reasoned that dismissal was warranted in light of its conclusion that the remaining seed was not copied by Chromatic, and because of "the rather remarkable circumstances of this case, and the serious consequences of Business Guides' improper conduct." *Id.* Finally, the court considered but rejected the possibility of ordering Business Guides to reimburse the public fisc for the cost of the court's time. *Id.* The court reasoned that the deterrent purpose of Rule 11 was adequately served by the monetary sanction and dismissal of the action. From this order of sanctions and dismissal, Business Guides appeals.

## II

We review de novo the district court's determination, based on undisputed facts, that conduct constitutes a violation of Rule 11. *Zaldivar v. City of Los Angeles,* 780 F.2d 823, 828 (9th Cir.1986) (*Zaldivar*). The appropriateness of the sanction imposed is reviewed for abuse of discretion. *Golden Eagle Distributing Corp. v. Burroughs Corp.,* 801 F.2d 1531, 1538 (9th Cir.1986) (*Golden Eagle*).

Business Guides challenges the district court's imposition of Rule 11 sanctions on two grounds: the district court erred in (1) applying to Business Guides, a represented party, an *objective* standard of "reasonable inquiry" into the factual basis of papers submitted to court; and in (2) determining that Business Guides failed to conduct a reasonable inquiry. Business Guides also

contends that the district court abused its discretion in dismissing Business Guides's action as part of the Rule 11 sanction imposed. Chromatic requests us to impose additional Rule 11 sanctions upon Business Guides to compensate Chromatic for its costs of defending this appeal and to preserve the deterrent effect of the sanction. We address these arguments in turn.

### A.

We first consider Business Guides's argument that the district court erroneously applied an objective standard of reasonable factual inquiry to a represented party. This is a purely legal question involving construction of Rule 11. We therefore review it de novo. *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

Rule 11 was amended significantly in 1983. The purpose behind the 1983 Amendments was to "revitalize the Rule by encouraging the use of sanctions where appropriate." *Zaldivar,* 780 F.2d at 829; *see also* Fed.R.Civ.P. 11 advisory committee note, *reprinted in* 97 F.R.D. 165, 198 (1983) (Committee Note) ("The new language is intended to reduce the reluctance of courts to impose sanctions"). Before its amendment, Rule 11 had been used infrequently. *See* Risinger, *Honesty in Pleading and Its Enforcement: Some "Striking" Problems with Federal Rule of Civil Procedure 11,* 61 Minn.L.Rev. 1, 34–37 (1976) (only 23 reported cases in which parties sought sanctions between 1938 and 1976). Since 1983, under Rule 11's broader provisions for imposing sanctions for frivolous litigation, Rule 11 litigation has become a veritable cottage industry. *See Golden Eagle,* 801 F.2d at 1537.

At the heart of revitalized Rule 11 are its enlarged standards of sanctionable conduct for both attorneys and their clients. Under the amended rule there are basically three types of submitted papers which warrant sanctions: factually frivolous (not "well grounded in fact"); legally frivolous (not "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law"); and papers "interposed for an improper purpose." Fed.R.Civ.P. 11. The amended rule also requires that a "reasonable" prefiling inquiry be conducted into the law and facts. It also *requires* judges to impose sanctions for any violation of the rule's standards while allowing judges considerable discretion in the choice of what sanction is appropriate.

In this circuit and others, courts have repeatedly emphasized that amended Rule 11 imposes an *objective* standard of conduct. *See, e.g., In re Disciplinary Action against Mooney,* 841 F.2d 1003, 1005 (9th Cir.1988) (*Mooney*) ("The requirements of Rule 11 are measured by an objective standard. Subjective good faith is not relevant."); *Unioil v. E.F. Hutton & Co., Inc.,* 809 F.2d 548, 557 (9th Cir.1986) (*Unioil*), *cert. denied,* 484 U.S. 822, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987); *Golden Eagle,* 801 F.2d at 1538; *Zaldivar,* 780 F.2d at 829 ("The new text represents an intentional abandonment of the subjective focus of the Rule in favor of an objective one."); *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 253 (2d Cir.1985) ("Simply put, subjective good faith no longer provides the safe harbor it once did."), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); *see also* Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181, 187 (1985) ("There is no room for a pure heart, empty head defense under Rule 11."). However, these cases involved sanctions imposed on attorneys rather than represented parties.

■ The issue we face is whether rule 11 prescribes a different standard of "reasonable inquiry" into the facts for represented parties than for attorneys. This is an issue of first impression in this circuit.

We begin with the language of Rule 11. Amended Rule 11 provides in part:

Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated. A party who is not represented by an attor-

ney shall sign the party's pleading, motion or other paper and state the party's address.... The signature of an *attorney or party* constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; *that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact* and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion or other paper is signed in violation of this ·rule, *the court,* upon motion, or upon its own initiative, *shall impose upon the person who signed it, a represented party, or both,* an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Fed.R.Civ.P. 11 (emphasis added). As the highlighted language demonstrates, Rule 11's language provides no support for Business Guides's claim that represented parties are not subject to an objective standard of reasonableness. To begin with, the rule clearly authorizes, indeed requires, a judge to sanction a represented party for violations. Significantly, the rule draws no distinction between the state of mind of attorneys and parties. There is nothing in the rule to suggest that a represented party may only be sanctioned for bad faith. On the contrary, the rule, by requiring any "signer" of a paper (attorney *or* party) to conduct a "reasonable inquiry," would appear to prescribe similar standards for attorneys and represented parties.

Nor does the Advisory Committee Note to Rule 11 provide solid support for Business Guides's suggested interpretation. As for the amended rule's new, explicit authorization to sanction clients, the Committee Note states that "[e]ven though it is the attorney whose signature violates the rule, it may be appropriate under the circumstances of the case to impose a sanction on the client." *See* Committee Note, 97 F.R.D. at 200, *citing Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078 (2d Cir.1977) (*Browning*). The Committee Note does not convey an intention to apply different reasonable inquiry standards to attorneys and represented parties. On the contrary, the Committee Note reflects an intention to go beyond a bad faith standard for violations:

> The amended rule attempts to deal with the problem [of courts' reluctance to impose sanctions] by *building upon and expanding* the equitable doctrine permitting the court to award expenses, including attorney's fees, to a litigant whose opponent acts in *bad faith* in instituting or conducting litigation.
>
> . . . .
>
> The new language stresses the need for some prefiling inquiry into both the facts and the law to satisfy the affirmative duty imposed by the rule. The standard is one of reasonableness under the circumstances. This standard is *more stringent than the original good-faith formula* and thus it is expected that a greater range of circumstances will trigger its violation.

97 F.R.D. at 198–99 (emphasis added) (citations omitted). It appears that the drafters intended to expand the scope of Rule 11's coverage beyond mere bad faith to encompass certain *objectively* unreasonable submissions and prefiling inquiries.

Business Guides suggests that we adopt the rule announced by the Second Circuit in *Calloway v. Marvel Entertainment Group,* 854 F.2d 1452 (2d Cir.1988) (*Calloway*), *cert. granted on other grounds,* —— U.S. ——, 109 S.Ct. 1116, 103 L.Ed.2d 179 (1989). The court held in *Calloway* that "an 'objectively reasonable test' ... is appropriate only in evaluating the conduct of attorneys under Rule 11, not the conduct of parties represented by attorneys." *Id.* at 1474. The court explained that "a party

represented by an attorney should not be sanctioned for papers signed by the attorney unless the party had actual knowledge that filing the paper constituted wrongful conduct." *Id.* The *Calloway* rule has been applied within the Second Circuit. *See, e.g., Greenberg v. Hilton International Co.,* 870 F.2d 926, 934 (2d Cir.1989); *Quadrozzi v. City of New York,* 127 F.R.D. 63, 79 (S.D.N.Y.1989); *Alberts v. Wall Street Clearing Corp.,* 1989 WL 88585, 1989 U.S. Dist. LEXIS 7945, at 6 n. 1 (S.D.N.Y. July 13, 1989). In contrast to *Calloway,* the Fourth Circuit appears to apply an objective standard to represented parties' prefiling inquiry into facts. *See Cleveland Demolition Co. v. Azcon Scrap Corp.,* 827 F.2d 984, 987–88 (4th Cir.1987); *see also Portnoy v. Wherehouse Entertainment Co.,* 120 F.R.D. 73, 74 (N.D.Ill. 1988).

In rejecting an objective reasonableness standard of inquiry for represented parties, the Second Circuit in *Calloway* offered two reasons. First, the court reasoned that "[a]s licensed professionals and officers of the court, attorneys are expected to measure up to minimal standards of professional competence under the Rule and thus may not excuse their conduct on the ground that they were acting in good faith." 854 F.2d at 1474. Second, the court deemed significant the Committee Note's citation to a prior Second Circuit case, arguing that "[a]s guidance, the Committee cited *Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078 (2d Cir.1977), a case holding that a represented party should not be held liable for wrongful conduct by attorneys unless the party was personally aware of or responsible for the conduct." *Id.*

We do not agree with the Second Circuit's reasons for adopting a subjective standard for represented parties. *Calloway's* first rationale—that attorneys, as licensed professionals, should be held to a higher standard of conduct—is a factor which the rule already takes into account. As the Committee Note instructs, "[t]he standard [of reasonable inquiry] is one of reasonableness *under the circumstances.*" Committee Note, 97 F.R.D. at 198 (empha-

sis added). Obviously, what is objectively reasonable for a client may differ from what is objectively reasonable for an attorney. Moreover, the Committee Note instructs that willfulness or bad faith should be considered by the sanctioning judge in setting the appropriate sanction once it has been determined that a violation has occurred. *See id.* at 200 ("The reference in the former text to willfulness as a prerequisite to disciplinary action has been deleted. However, in considering the nature and severity of the sanctions to be imposed, the court should take account of the attorney's or party's actual or presumed knowledge when the pleading or paper was signed."). Finally, the Second Circuit's "licensed professional" argument has greater force in cases involving failures to conduct reasonable prefiling inquiries into the *law.* Where a violation occurs because of failure to make a reasonable inquiry into the *factual* underpinnings of a paper or pleading, the client may be in an equal or better position than the lawyer. This is not to say that the lawyer has only a minimal or secondary obligation to investigate the facts provided by the client—only that the client shares this obligation. Here, Business Guides was obviously in a superior position to understand its "seeding" system than was Finley Kumble.

We also do not read the Committee Note's reference to *Browning* as reflecting an intent to require a showing of bad faith when imposing Rule 11 sanctions on parties. The Committee Note states:

Even though it is the attorney whose signature violates the rule, it may be appropriate under the circumstances of the case to impose a sanction on the client. See *Browning Debenture Holders' Committee v. DASA Corp., supra.* This modification brings Rule 11 in line with practice under Rule 37, which allows sanctions for abuses during discovery to be imposed upon the party, the attorney, or both.

*Id.* at 200. This paragraph, like the two paragraphs in the Committee Note immediately preceding it, explains a change in Rule 11's text which merely makes explicit

the authorization for a particular sanctioning practice which some courts, prior to the amendment, had interpreted the prior version of the rule to allow. *See also id.* ("Courts currently appear to believe that they may impose sanctions on their own motion. Authority to do so has been made explicit....") (citation omitted); *id.* ("If the duty imposed by the rule is violated, the court should have the discretion to impose sanctions on either the attorney, the party the signing attorney represents, or both ... and the new rule so provides. Although Rule 11 has been silent on this point, courts have claimed the power to impose sanctions on an attorney personally. ... The amended rule should eliminate any doubt as to the propriety [of this practice].") (citations omitted). Thus, the Committee Note cites to *Browning* only as an example of a practice which the rule, as amended, explicitly authorizes—imposing a sanction upon a client.

The Second Circuit's conclusion that the Committee Note, by citing *Browning*, demonstrated an intent for a subjective standard to apply to represented parties is flawed for several other reasons as well. First, the fact that *Browning* required subjective bad faith is unexceptional: *every* case cited by the Committee Note required subjective bad faith as a prerequisite to Rule 11 sanctions. The objective standard did not exist prior to the 1983 amendments. Second, *Browning* itself did not involve any failure by the client or attorney to investigate the facts giving rise to the action. Instead, *Browning* involved a sanction for improper purpose. The district court in *Browning* had held that the plaintiffs "had acted in bad faith in instituting and maintaining this action" because plaintiffs' purpose was to obtain a reduction in the conversion price of certain debentures rather than to vindicate their legal rights. *Browning,* 560 F.2d at 1088.

Based on our reading of the text of Rule 11 and the Committee Note, we agree with the Fourth Circuit and conclude that represented parties should be held to an objective standard of "reasonable inquiry" into the facts. *See* Note, *A Uniform Approach To Rule 11 Sanctions,* 97 Yale L.J. 901, 915 (1988) ("If a client knowingly provides false facts, or provides facts that the client *should have known were false,* then the client should be sanctioned.") (footnotes omitted) (emphasis added). Our holding is consistent with our repeated statements, albeit in slightly different contexts, that Rule 11 as amended imposes an objective standard of conduct. *See Mooney,* 841 F.2d at 1005; *Unioil,* 809 F.2d at 557; *Golden Eagle,* 801 F.2d at 1538; *Zaldivar,* 780 F.2d at 829. Even the "improper purpose" prong of Rule 11, which requires sanctions for submissions "interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation," Fed.R. Civ.P. 11, has been interpreted in this circuit to impose an objective standard. *See Zaldivar,* 780 F.2d at 832 ("Harassment under Rule 11 focuses upon the improper purpose of the signer, *objectively tested,* rather than the consequences of the signer's act, subjectively viewed by the signer's opponent.") (emphasis added).

In addition, it is settled that pro se litigants are held to an objective standard of reasonableness under Rule 11. *See* Committee Note, 97 F.R.D. at 199. The Committee Note suggests that "[a]lthough the standard is the same for unrepresented parties, ... the court has sufficient discretion to take account of the special circumstances that often arise in *pro se* situations." *Id.* Mention of the court's "discretion" merely acknowledges that (1) what is objectively reasonable for a pro se litigant and for an attorney may not be the same, and (2) the pro se status of a violator may be relevant to the court's discretionary choice of the appropriate sanction in a given case. We fail to see why represented parties should be given the benefit of a subjective bad faith standard whereas pro se litigants, who do not enjoy the aid of counsel, are held to a higher objective standard.

Our holding is also consistent with the primary purpose behind Rule 11: deterrence of frivolous litigation. *See In re Yagman,* 796 F.2d 1165, 1184 (9th Cir.) (deterrence "paramount" and "overriding"

purpose of Rule 11), *amended,* 803 F.2d 1085 (9th Cir.1986), *cert. denied,* 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987). An objective standard for represented parties will ensure greater vigilance in investigating factually baseless claims. *See also Zaldivar,* 780 F.2d at 829 ("Our conclusion that subjective bad faith is not an element to be proved under present Rule 11 is consistent with the advisory committee's purpose to revitalize the Rule by encouraging the use of sanctions where appropriate.") (attorney sanctions). Subjective bad faith is more difficult to demonstrate, and efforts to uncover it can spawn satellite litigation.

■ In holding that an objective standard applies to lawyers and represented parties alike, we do not suggest that what is a "reasonable" inquiry for an attorney is also a "reasonable" inquiry for a client. As mentioned above, Rule 11's objective reasonableness standard "is one of reasonableness under the circumstances." Committee Note, 97 F.R.D. at 198; *see also id.* at 199 ("[W]hat constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer...").

### B.

Having determined that the district court correctly chose to apply an objective standard of reasonable inquiry to Business Guides, we now consider whether Business Guides violated that standard.

The district court agreed with the magistrate that Business Guides had violated Rule 11 by failing to conduct a reasonable factual inquiry on three separate occasions: (1) before filing the initial TRO papers, (2) before submitting Lambe's supplemental affidavit on November 7, and (3) before appearing at the first two hearings in front of the magistrate. *Business Guides I,* 119 F.R.D. at 689.

■ We agree with the district court that the first two instances of conduct violated Rule 11. Business Guides is a sophisticated business entity that has extensive experience with copyright litigation. Its papers repeatedly characterize it as a pioneer in the seeding method, which Business Guides's parent company, Lebhar–Friedman, has employed for over 40 years. It was unreasonable for Business Guides to take no steps whatsoever to verify the ten seeds before filing its papers and request for a TRO. As the district court correctly observed, "Business Guides could easily have checked on the accuracy of the identified seeds (as the court did) prior to submitting the information in an affidavit." *Id.* The district court's law clerk spent one hour and discovered that six of the allegedly false "seeds" in fact contained accurate information. We agree with the district court that Business Guides cannot rely on the alleged accuracy of its seed list as a shield from Rule 11 liability.

■ We also agree with the district judge that Business Guides and Lambe violated Rule 11 by submitting Lambe's supplemental affidavit on November 7. The district judge's law clerk requested Business Guides's counsel for more specific information on the ten seeds. In searching for this information, Lambe, the Director of Research for Business Guides, also independently attempted to verify the information in the seeds by comparing it against subsequent editions of the Directory and postal zip code lists. Lambe discovered that three or four of the seeds were baseless. This discovery should have spurred Lambe to conduct a much more thorough investigation of the remaining seeds. We reject Business Guides's contention that Lambe should be commended for undertaking his investigation into the seeds' accuracy in the first place. Lambe's inquiry fell short of objective reasonableness under the circumstances of this case.

We also reject Business Guides's attempt to excuse its deficient inquiry by pointing to the short time frame in which it was operating. Business Guides stresses that it was seeking a TRO against Chromatic to prevent Chromatic from displaying its product at an impending trade show. Yet Business Guides apparently suspected Chromatic of copying for two years before this action was filed. Any haste in the

initial filing was occasioned by Business Guides's own actions. In addition, we reject Business Guides's argument that Lambe had only two hours to review his affidavit on November 7. Two hours was more time than it took the law clerk to uncover the problems with the seeds. Even so, the argument is curious that when a party is facing its self-imposed deadline, it is excused from what would otherwise be unreasonable. Nevertheless, Lambe had not just two hours but several days if one considers the time between Lambe's discovery of the inaccurate seeds and the TRO hearing.

■ Although we agree with two of the district court's bases for imposing Rule 11 sanctions, we agree with Business Guides that the district court erroneously applied Rule 11 to *oral* representations and testimony made to the magistrate. The district court refused to "interpret Rule 11 as permitting oral misrepresentation while forbidding the same misrepresentation in writing." *Business Guides I,* 119 F.R.D. at 690. The court also reasoned that "[t]he arguments advanced in this case were made in connection with pleadings filed with the court and therefore fall within the scope of Rule 11." *Id.* We disagree. The use of Rule 11 is foreclosed by the rule's plain language. Rule 11 applies only to a "pleading, motion, or other *paper*." Fed. R.Civ.P. 11 (emphasis added). In keeping with this focus, Rule 11 imposes a signature requirement. The signature represents a certification by the signer that Rule 11's standards have been met. Sanctions are authorized only "[i]f a pleading, motion, or other paper is signed in violation of this rule," and the court is authorized to sanction only "the person who signed [the paper], a represented party, or both." *Id.*

We are aware of no case which authorizes an application of Rule 11 to oral representations. Nor did the district court cite any authority for this holding. In the absence of contrary binding authority, we follow the plain language of the rule and hold that Rule 11 does not apply to oral arguments or testimony before the court or magistrate. Courts have other weapons besides Rule 11 to combat oral misrepresentations by lawyers or witnesses. Although we reverse the application of Rule 11 to oral representations, we affirm the district court's finding that Rule 11 was violated on the other two grounds.

### C.

Business Guides next argues that the district court erred in dismissing its action as part of the Rule 11 sanction imposed. We review the appropriateness of the particular sanction chosen for abuse of discretion. *Golden Eagle,* 801 F.2d at 1538.

In light of our reversal of one of the three instances of sanctionable conduct found by the district court, we need not address this issue. The district judge's choice of sanction hinged in part upon "the rather remarkable circumstances of this case, and the serious consequences of Business Guides' improper conduct." *Business Guides II,* 121 F.R.D. at 406. We cannot know if the district court will consider a sanction of dismissal appropriate in view of Business Guides's two rather than three violations. We therefore vacate the district court's choice of this sanction and remand for reconsideration in light of this opinion.

### D.

■ Chromatic also seeks Rule 11 sanctions for this appeal. While we may impose Rule 11 sanctions on parties whose papers submitted to this court violate Rule 11, *see Partington v. Gedan,* 880 F.2d 116, 130 & n. 8 (9th Cir.1989); *In re Curl,* 803 F.2d 1004, 1007 (9th Cir.1986), Chromatic does not argue (nor could it successfully) that Business Guides's appellate briefs violate the rule. Instead, Chromatic argues that a party who successfully defends a Rule 11 sanction on appeal should be awarded the costs of attorneys' fees *automatically.* According to this argument, since Chromatic has successfully defended the determination that Rule 11 ultimately was violated, it should be entitled to at least a portion of its fees. Otherwise, its victory of fees in the trial will be dissipated in paying for fees on appeal.

There is ample out-of-circuit authority for this proposition. *See, e.g., Danik, Inc. v. Hartmarx Corp.,* 875 F.2d 890, 897–98 (D.C.Cir.1989) *(Danik); Gorenstein Enter-*

*prises, Inc. v. Quality Care–USA, Inc.,*
874 F.2d 431, 438 (7th Cir.1989) *(Goren-
stein); Ballard's Service Center, Inc. v.
Transue,* 865 F.2d 447, 450 (1st Cir.1989);
*Hays v. Sony Corp. of America,* 847 F.2d
412, 419 (7th Cir.1988); *Muthig v. Brant
Point Nantucket, Inc.,* 838 F.2d 600, 607
(1st Cir.1988) *(Muthig); see also West-
moreland v. CBS, Inc.,* 770 F.2d 1168,
1179–80 (D.C.Cir.1985) *(Westmoreland)*
(successful appeal from denial of Rule 11
sanctions). In awarding successful appel-
lees the legal costs of their appeals under
Rule 11, these courts have reasoned that
such costs are part of the "reasonable ex-
penses *incurred because of"* the frivolous
filing in the district court. *Muthig,* 838
F.2d at 607, *quoting* Fed.R.Civ.P. 11 (em-
phasis added); *see also Danik,* 875 F.2d at
897–98. These courts have concluded that
the practice of awarding attorneys' fees on
appeal in this situation both preserves the
incentives to seek sanctions in the district
court and furthers the underlying goals of
Rule 11. *Gorenstein,* 874 F.2d at 438;
*Muthig,* 838 F.2d at 607; *Westmoreland,*
770 F.2d at 1179.

Were we writing on a clean slate, we
might find these arguments persuasive.
However, in this circuit the slate is not
clean. Business Guides correctly points
out that *Orange Production Credit Asso-
ciation v. Frontline Ventures, Ltd.,* 801
F.2d 1581 (9th Cir.1986), requires us to
reject Chromatic's request for attorneys'
fees on appeal. In *Orange Production,* we
rejected the argument that the legal costs
of defending an award of Rule 11 sanctions
on appeal were costs "incurred because of"
the filing in the district court. *Id.* at 1582.
We reasoned that "[i]f we were to award
sanctions of attorneys' fees on appeal
based on this analysis ... then every appel-
lee who succeeded in preserving a favor-
able trial court award in a Rule 11 case
would be entitled to fees on appeal regard-
less of the substance of the appeal." *Id.*
Nor were we swayed by the argument that
awarding Rule 11 sanctions to successful
appellees would preserve the effectiveness
of the sanction awarded in the trial court.
*Id.* at 1582–83.

In holding that sanctions were unavail-
able in this situation, we followed the
Fourth Circuit's decision in *Basch v. West-
inghouse Electric Corp.,* 777 F.2d 165, 175
(4th Cir.1985), *cert. denied,* 476 U.S. 1108,
106 S.Ct. 1957, 90 L.Ed.2d 365 (1986). We
also distinguished the District of Columbia
Circuit's decision in *Westmoreland* on the
grounds that it involved an appeal from the
*denial* of Rule 11 sanctions. While our
decision in *Orange Production* has been
criticized, *see Danik,* 875 F.2d at 898, *Or-
ange Production* remains the law of this
circuit. We must therefore reject Chro-
matic's request for Rule 11 sanctions for
this appeal.

We affirm the district court's determina-
tion that Business Guides violated Rule 11
by failing to conduct a reasonable prefiling
inquiry into the facts before (1) signing the
original complaint, and (2) submitting
Lambe's supplemental declaration. We re-
verse, however, its holding that oral repre-
sentations of Business Guides's employees
violated Rule 11. We do not know the
impact this will have on the monetary
award or dismissal of the action. There-
fore, we vacate the order of sanctions and
remand to allow the district court to recon-
sider its choice of sanctions in light of our
determination.

AFFIRMED IN PART, REVERSED IN
PART, VACATED IN PART, AND RE-
MANDED.