# BUSINESS GUIDES, INC. *v.* CHROMATIC COMMUNICATIONS ENTERPRISES, INC., ET AL.

No. 89–1500.   Argued November 26, 1990—Decided February 26, 1991

534

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, and SOUTER, JJ., joined.  KENNEDY, J.,

filed a dissenting opinion, in which MARSHALL and STEVENS, JJ., joined, and in Parts I, III, and IV of which SCALIA, J., joined, *post*, p. 554.

*Stephen V. Bomse* argued the cause for petitioner. With him on the briefs were *Stephen N. Goldberg* and *Joshua R. Floum.*

*Neil L. Shapiro* argued the cause and filed a brief for respondents.*

JUSTICE O'CONNOR delivered the opinion of the Court.

In this case we decide whether Rule 11 of the Federal Rules of Civil Procedure imposes an objective standard of reasonable inquiry on represented parties who sign pleadings, motions, or other papers.

## I

Business Guides, Inc., a subsidiary of a leading publisher of trade magazines and journals, publishes directories for 18 specialized areas of retail trade. In an effort to protect its directories against copying, Business Guides deliberately plants in them bits of false information, known as "seeds." Some seeds consist of minor alterations in otherwise accurate listings—transposed numbers in an address or zip code, or a misspelled name—while others take the form of wholly fictitious listings describing nonexistent businesses. Business Guides considers the presence of seeds in a competitor's directory to be evidence of copyright infringement.†

On October 31, 1986, Business Guides, through its counsel Finley, Kumble, Wagner, Heine, Unterberg, Manley, Myerson, and Casey (Finley, Kumble), filed an action in the United States District Court for the Northern District of

---

*\*Alan B. Morrison* filed a brief for Public Citizen as *amicus curiae* urging reversal.

†Given the posture of this case, we have no occasion to consider whether the information contained in such a directory would actually be copyrightable. See *Feist Publications, Inc.* v. *Rural Telephone Serv. Co.*, cert. granted, *post*, p. 808.

California against Chromatic Communications Enterprises, Inc., claiming copyright infringement, conversion, and unfair competition, and seeking a temporary restraining order (TRO). The TRO application was signed by a Finley, Kumble attorney and by Business Guides' president on behalf of the corporation. Business Guides submitted under seal affidavits in support of the application. These affidavits charged Chromatic with copying, as evidenced by the presence of 10 seeds in Chromatic's directory. One affidavit, that of sales representative Victoria Burdick, identified the 10 listings in Business Guides' directory that had allegedly been copied, but did not pinpoint the seed in each listing.

A hearing on the TRO was scheduled for November 7, 1986. Three days before the hearing, the District Judge's law clerk phoned Finley, Kumble and asked it to specify what was incorrect about each listing. Finley, Kumble relayed this request to Business Guides' Director of Research, Michael Lambe. This was apparently the first time the law firm asked its client for details about the 10 seeds. Based on Lambe's response, Finley, Kumble informed the court that Business Guides was retracting its claims of copying as to three of the seeds. The District Court considered this suspicious and so conducted its own investigation into the allegations of copying. The District Judge's law clerk spent one hour telephoning the businesses named in the "seeded" listings, only to discover that 9 of the 10 listings contained no incorrect information.

Unaware of the District Court's discovery, Finley, Kumble prepared a supplemental affidavit of Michael Lambe, identifying seven listings in Chromatic's directory and explaining precisely what part of each listing supposedly contained seeded information. Lambe signed this affidavit on the morning of the November 7 hearing. Before doing so, however, Lambe crossed out reference to a fourth seed that he had determined did not in fact reflect any incorrect information but which Finley, Kumble had not retracted.

At the hearing, the District Court, based on its discovery that 9 of the original 10 listings contained no incorrect information, denied the application for a TRO. More importantly, the judge stayed further proceedings and referred the matter to a Magistrate to determine whether Rule 11 sanctions should be imposed. The Magistrate conducted two evidentiary hearings, at which he instructed Business Guides and Finley, Kumble to explain why 9 of its 10 charges of copying were meritless. Both claimed it was a coincidence. Doubting the good faith of these representations, the Magistrate recommended that both the law firm and the client be sanctioned. See App. to Pet. for Cert. 64a–75a.

Later, claiming to have uncovered the true source of the errors, the parties asked for and received a third hearing. Business Guides explained that in compiling its "master seed list," it had departed from its normal methodology. Usually, letters and numbers were transposed deliberately and recorded on the seed list before the directory was published. In this case, the company had compiled the master seed list *after* publication by looking for unintended typographical errors in the directory. To locate such errors, sales representative Victoria Burdick had compared the final version of the directory against initial questionnaires that had been submitted to Business Guides by businesses that wanted to be listed. When Burdick discovered a disparity between a questionnaire and the final directory, she included it on the seed list. She assumed, without investigating, that the information on the questionnaires was accurate. As it turned out, the questionnaires themselves sometimes contained transposed numbers or misspelled names, which other employees had corrected when proofreading the directory prior to publication. Consequently, many of the seeds appearing on the master list contained no false information. The presence of identical listings in a competitor's directory thus would not indicate copying, but rather accurate research.

The Magistrate accepted this explanation, but determined that sanctions were nonetheless appropriate. *Id.*, at 48a. First, he found that Business Guides, in filing the initial TRO application, had "failed to conduct a proper inquiry, resulting in the presentation of unreasonable and false information to the court." *Id.*, at 53a. The Magistrate did not recommend that Finley, Kumble be sanctioned for the initial application, however, as the firm had been led to believe that there was an urgent need to act quickly and thus relied on the information provided by its sophisticated corporate client. *Id.*, at 54a–55a. Next, the Magistrate recommended that both Business Guides and Finley, Kumble be sanctioned for having failed to inquire into the accuracy of the remaining seeds following Michael Lambe's discovery, based on only a few minutes of investigation, that 3 of the 10 were invalid. *Id.*, at 55a–56a. Finally, the Magistrate recommended that both the law firm and its client be sanctioned for their conduct at the first two evidentiary hearings. Instead of investigating the cause of the errors in the seed list, Business Guides and Finley, Kumble had relied on a "coincidence" defense. *Id.*, at 51a. The Magistrate determined that "[n]o reasonable person would have been satisfied with these explanations. . . . Finley, Kumble and Business Guides did not need this court to point out the blatant errors in the logic of their representations." *Id.*, at 59a.

The District Court agreed with the Magistrate, stating: "The standard of conduct under Rule 11 is one of objective reasonableness. Applying this standard to the circumstances of this case, it is clear that both Business Guides and Finley Kumble have violated the Rule." 119 F. R. D. 685, 688–689 (ND Cal. 1988). The court reiterated the Magistrate's conclusion that: (1) Business Guides violated Rule 11 by filing the initial TRO application; (2) Business Guides and Finley, Kumble violated the Rule by failing to conduct a reasonable inquiry once they were put on notice of several inaccuracies; and (3) Business Guides and Finley, Kumble vio-

lated the Rule in their arguments to the Magistrate at the first two evidentiary hearings. *Id.*, at 689. Rather than impose sanctions at that time, the District Court unsealed the proceedings and invited Chromatic to file a motion requesting particular sanctions. *Id.*, at 690.

Chromatic brought a motion for sanctions against both Business Guides and Finley, Kumble. It later moved to withdraw the motion with respect to Finley, Kumble, after learning that the law firm had recently dissolved and that all proceedings against the firm were stayed under § 362 of the Bankruptcy Code. 121 F. R. D. 402, 403 (ND Cal. 1988). The District Court accepted this withdrawal and issued its ruling without prejudice to Chromatic's right to pursue sanctions against Finley, Kumble at a later date. *Ibid.*

Before ruling on the motion for sanctions against Business Guides, the District Court made additional factfindings. It observed that of the 10 seeds that had originally been alleged to be present in Chromatic's directory, only one actually contained false information. *Ibid.* This seed was a wholly fictitious listing for a company that did not exist. Chromatic denied that it had copied this listing from Business Guides' directory; it offered an alternative explanation—that Business Guides had "planted" the fake listing in Chromatic's directory. A Business Guides employee had requested a copy of Chromatic's directory, filled out a questionnaire providing information about the nonexistent company, and mailed this questionnaire to Chromatic intending that the company publish the false listing in its directory. *Id.*, at 403–404. Business Guides did not deny the truth of these charges, and the District Court found that petitioner's silence amounted to a "tacit admission." *Id.*, at 404. In light of this finding, the court had no choice but to conclude: "Business Guides' entire lawsuit has no basis in fact." "[T]here was, and is, no evidence of copyright infringement." *Ibid.*

The court then ruled on Chromatic's motion for sanctions. Citing "the rather remarkable circumstances of this case, and

the serious consequences of Business Guides' improper conduct," it dismissed the action with prejudice. *Id.*, at 406. Additionally, it imposed $13,865.66 in sanctions against Business Guides, the amount of Chromatic's legal expenses and out-of-pocket costs. *Id.*, at 405.

The Court of Appeals for the Ninth Circuit affirmed the District Court's holdings that Business Guides was subject to an objective standard of reasonable inquiry into the factual basis of papers submitted to the court, and that Business Guides had failed to conduct a reasonable inquiry before (1) signing the initial TRO application, and (2) submitting Michael Lambe's supplemental declaration. 892 F. 2d 802, 811 (1989). The court relied on the plain language of Rule 11, which "draws no distinction between the state of mind of attorneys and parties. . . . On the contrary, the rule, by requiring any 'signer' of a paper (attorney *or* party) to conduct a 'reasonable inquiry,' would appear to prescribe similar standards for attorneys and represented parties." *Id.*, at 809 (emphasis in original). The Court of Appeals reversed, however, the District Court's holding that oral representations and testimony before the Magistrate violated Rule 11. *Id.*, at 813. Because it reversed one of the three bases on which Business Guides had been sanctioned, the Court of Appeals vacated the order of sanctions and remanded to the District Court for reconsideration. *Id.*, at 813–814. We granted certiorari to determine whether the Court of Appeals properly held Business Guides to an objective standard of reasonable inquiry. 497 U. S. 1002 (1990). Subsequently, the District Court issued an order reaffirming the dismissal and monetary sanctions. App. to Pet. for Cert. 1a–2a.

## II

### A

"We give the Federal Rules of Civil Procedure their plain meaning." *Pavelic & LeFlore* v. *Marvel Entertainment Group*, 493 U. S. 120, 123 (1989). As with a statute, our in-

quiry is complete if we find the text of the Rule to be clear
and unambiguous. Rule 11 provides in relevant part: "The
signature of an attorney *or party* constitutes a certificate by
the signer that . . . to the best of the signer's knowledge, in-
formation, and belief *formed after reasonable inquiry* it is
well grounded in fact . . . . If a pleading, motion, or other
paper is signed in violation of this rule, the court . . . shall
impose *upon the person who signed it* . . . an appropriate
sanction" (emphasis added). Thus viewed, the meaning of
the Rule seems plain: A party who signs a pleading or other
paper without first conducting a reasonable inquiry shall be
sanctioned. Business Guides argues, however, that the
Rule's meaning is not so clear when one reads the full text.
Accordingly, we reproduce below the full text of Rule 11,
adding bracketed numbers before each sentence to clarify the
discussion that follows:

> "[1] Every pleading, motion, and other paper of a
> party represented by an attorney shall be signed by at
> least one attorney of record in the attorney's individual
> name, whose address shall be stated. [2] A party who
> is not represented by an attorney shall sign the party's
> pleading, motion, or other paper and state the party's
> address. [3] Except when otherwise specifically pro-
> vided by rule or statute, pleadings need not be verified
> or accompanied by affidavit. [4] The rule in equity that
> the averments of an answer under oath must be over-
> come by the testimony of two witnesses or of one witness
> sustained by corroborating circumstances is abolished.
> [5] The signature of an attorney or party constitutes a
> certificate by the signer that the signer has read the
> pleading, motion, or other paper; that to the best of the
> signer's knowledge, information, and belief formed after
> reasonable inquiry it is well grounded in fact and is war-
> ranted by existing law or a good faith argument for the
> extension, modification, or reversal of existing law, and
> that it is not interposed for any improper purpose, such

as to harass or to cause unnecessary delay or needless increase in the cost of litigation. [6] If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. [7] If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee."

We find nothing in the full text of the Rule that detracts from the plain meaning of the relevant portion quoted initially. Rule 11 is "aimed at curbing abuses of the judicial system." *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 397 (1990). To this end, it sets up a means by which litigants certify to the court, by signature, that any papers filed are well founded. The first three sentences of the Rule explain in what instances a signature is mandatory. Sentence [1] states that where a party is represented by counsel, the party's attorney must sign any motion, pleading, or other paper filed with the court. Sentence [2] provides that where a party is proceeding *pro se*, the unrepresented party must sign the documents. Sentence [3] acknowledges that in some situations represented parties are required by rule or statute to verify pleadings or sign affidavits. Sentence [4] explains that certification by signature replaces some older forms of oath and attestation.

The heart of Rule 11 is sentence [5], which explains in detail the message conveyed by the signing of a document. A signature certifies to the court that the signer has read the document, has conducted a reasonable inquiry into the facts and the law and is satisfied that the document is well grounded in both, and is acting without any improper motive.

See 5A C. Wright & A. Miller, Federal Practice and Procedure § 1335, pp. 57–58 (2d ed. 1990) (hereinafter Wright & Miller). This sentence, by its terms, governs any signature of "an attorney or party," thereby making it applicable not only to signatures required by sentences [1], [2], and [3], but also to signatures that are not required but nevertheless present. "The certification requirement now mandates that *all* signers consider their behavior in terms of the duty they owe to the court system to conserve its resources and avoid unnecessary proceedings." *Id.*, § 1331, at 21 (emphasis added). The final two sentences describe the means by which the Rule is enforced. Sentence [6] dictates that where a required signature is missing and the omission is not corrected promptly, the document will be stricken. Sentence [7] requires that sanctions be imposed where a signature is present but fails to satisfy the certification standard.

Business Guides proposes an alternative interpretation of the text. As mentioned, sentence [1] indicates that a party who is represented by counsel is not itself required to sign most papers or pleadings; generally, only the signature of the attorney is mandated. Business Guides concludes from this that a represented party may, if it wishes, sign a document, but that this signature need not comply with the certification standard described in sentence [5]. Because a client's signature is not normally required by Rule 11, the occasional presence of one cannot run afoul of the Rule. In short, Business Guides maintains that a represented party is free to sign frivolous or vexatious documents with impunity because its signature on a document carries with it no additional risk of sanctions.

This reading is inconsistent with both the language and the purpose of Rule 11. As an initial matter, it is not relevant that represented parties rarely sign filed documents, because Business Guides did sign in this case. Indeed, it was required to do so. Rule 65(b) of the Federal Rules of Civil Procedure provides specifically that a TRO application must be

accompanied by an affidavit or verified complaint that sets forth the facts. A TRO application is thus one of the situations provided for in sentence [3], where a party's verification or signed affidavit is mandatory. Even if Business Guides had not been required to sign the TRO application but did so voluntarily, the language of Rule 11 would still require that the signature satisfy the certification requirement. Sentence [1] may not require a represented party to sign papers and pleadings, but neither does it prohibit a represented party from attesting to the merit of documents filed on its behalf. "When a party is represented by counsel, it is unnecessary, but not improper, for the represented party to sign as well." Wright & Miller § 1333, at 47. Accordingly, sentence [5] declares that the signature of a party conveys precisely the same message as that of an attorney: "The signature of an attorney *or party* constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that . . . it is well grounded in fact and is warranted by existing law." (Emphasis added.) It seems plain that the voluntary signature of a represented party, no less than the mandatory signature of an attorney, is capable of violating the Rule.

The only way that Business Guides can avoid having to satisfy the certification standard is if we read "attorney or party" as used in sentence [5] to mean "attorney or *unrepresented* party." Only then would the signature of a represented party fall outside the scope of the Rule. We decline to adopt this unnatural reading, as there is no indication that this is what the Advisory Committee intended. Just the opposite is true. Prior to its amendment in 1983, sentence [5] referred solely to "[t]he signature of an attorney" on a "pleading." The 1983 amendments deliberately expanded the coverage of the Rule. Wright & Miller § 1331, at 21. Sentence [5] was amended to refer broadly to "[t]he signature of an attorney *or party*" on a "pleading, motion, *or other paper*" (emphasis added). Represented parties, despite having counsel,

routinely sign certain papers—declarations, affidavits, and the like—during the course of litigation. Business Guides, for example, submitted to the District Court no fewer than five signed papers in support of its TRO application. The amended language of sentence [5] leaves little room for doubt that the signatures of the "party" on these "other papers" must satisfy the certification requirement.

Had the Advisory Committee intended to limit the application of the certification standard to parties proceeding *pro se,* it would surely have said so. Elsewhere in the text, the Committee demonstrated its ability to distinguish between represented and unrepresented parties. Sentence [1] refers specifically to "a party represented by an attorney," while sentence [2] applies to "[a] party who is *not* represented by an attorney" (emphasis added). Sentence [5], however, draws no such distinction; it lumps together the two types of parties. By using the more expansive term "party," the Committee called for more expansive coverage. The natural reading of this language is that *any* party who signs a document, whether or not the party was required to do so, is subject to the certification standard of Rule 11.

Leading scholars are in accord. Professors James Wm. Moore and Jo Desha Lucas, authors of Moore's Federal Practice, state: "The current Rule places an affirmative duty on the attorney or party to investigate the facts and the law prior to the subscription and submission of any pleading, motion or paper. . . . The rule applies to attorneys, parties represented by attorneys, and parties who appear pro se." 2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 11.02[3], pp. 11–15 to 11–17 (2d ed. 1990) (footnotes omitted). Professors Charles Alan Wright and Arthur R. Miller describe in their treatise on Federal Practice and Procedure "seven major alterations" of Rule 11 practice occasioned by the 1983 amendments, one of which is that "the range of people covered by the certification requirement . . . has been expanded. Now, *all* signers, not just attorneys, are on notice

that their signature constitutes a certification as to the contents of the document." Wright & Miller § 1331, at 21 (emphasis added). "The expansion of the scope of the certification requirement to include non-attorney signers was accomplished by changing 'signature of an attorney' in the fifth sentence of the rule to 'signature of an attorney or party.'" *Id.*, at 21–22, n. 54.

In addition to being the most natural reading, it is an eminently sensible one. The essence of Rule 11 is that signing is no longer a meaningless act; it denotes merit. A signature sends a message to the district court that this document is to be taken seriously. This case is illustrative. Business Guides sought a TRO on the strength of an initial application accompanied by five signed statements to the effect that Chromatic was pirating its directory. Because these documents were filed under seal, the District Court had to determine the credibility of the allegations without the benefit of hearing the other side's view. The court might plausibly have attached some incremental significance to the fact that Business Guides itself risked being sanctioned if the factual allegations contained in these signed statements proved to be baseless. Business Guides asks that we construe Rule 11 in a way that would render the signatures on these statements risk free. Because this construction is at odds with the Rule's general admonition that signing denotes merit, we are loath to do so absent a compelling indication in the text that the Advisory Committee intended such a result. Because we find no such indication, compelling or otherwise, we conclude that the word "party" in sentence [5] means precisely what it appears to mean.

The dissent contends that this conclusion is inconsistent with our decision last Term in *Pavelic & LeFlore*. See *post*, at 556, 562–564. Just the opposite is true; our decision today follows naturally from *Pavelic & LeFlore*. We held in *Pavelic & LeFlore* that Rule 11 contemplates sanctions against the particular individual who signs his or her name, not against

the law firm of which that individual is a member, because "the purpose of Rule 11 as a whole is to bring home to the individual signer his personal, nondelegable responsibility . . . to validate the truth and legal reasonableness of the papers filed." 493 U. S., at 126. This is entirely consistent with our decision here that a represented party who signs his or her name bears a personal, nondelegable responsibility to certify the truth and reasonableness of the document. The dissent agrees that a party proceeding without the benefit of legal assistance bears this responsibility, but insists that a party represented by counsel—even one whose signature is mandatory—is absolved from any duty to vouch for the truth of papers he or she signs because he or she has delegated this responsibility to counsel. See *post*, at 556.

The dissent's dichotomy between represented and unrepresented parties is particularly troubling given that it has no basis in the text of the Rule. Sentence [5] refers to "[t]he signature of an attorney *or party*" (emphasis added). We emphasized in *Pavelic & LeFlore* that this Court will not reject the natural reading of a rule or statute in favor of a less plausible reading, even one that seems to us to achieve a better result. 493 U. S., at 126–127. Yet JUSTICE KENNEDY proposes that we construe "party" to mean "*unrepresented party*"—notwithstanding the Advisory Committee's ability, demonstrated only three sentences earlier, to distinguish between represented and unrepresented parties—because he thinks it unwise to punish clients. See *post*, at 556–558.

The dissent also criticizes us for treating the signatures of Business Guides' president and director of research as signatures of the company. JUSTICE KENNEDY suggests that this is "in square conflict" with our holding in *Pavelic & LeFlore* that " 'the person who signed' " was the individual attorney, not the law firm. *Post*, at 563. The dissent overlooks an important distinction. In *Pavelic & LeFlore*, we relied in part on Rule 11's unambiguous statement that papers must be signed by an attorney "in the attorney's individual name."

493 U. S., at 125 (emphasis omitted). A corporate entity, of course, cannot itself sign anything; it can act only through its agents. It would be anomalous to determine that an individual who is represented by counsel falls within the scope of Rule 11, but that a corporate client does not because it cannot itself sign a document. In any event, the question need not be resolved definitely here; Business Guides concedes that it did not raise this argument in the courts below. Brief for Petitioner 35, n. 38.

## B

Having concluded that Rule 11 applies to represented parties, we must next determine whether the certification standard for a party is the same as that for an attorney. The plain language of the Rule again provides the answer. It speaks of attorneys and parties in a single breath and applies to them a single standard: "The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." As the Court of Appeals correctly observed: "[T]he rule draws no distinction between the state of mind of attorneys and parties." 892 F. 2d, at 809. Rather, it states unambiguously that any signer must conduct a "reasonable inquiry" or face sanctions.

Business Guides devotes much of its brief to arguing that subjective bad faith, not failure to conduct a reasonable inquiry, should be the touchstone for sanctions on represented parties. It points with approval to Rule 56(g) of the Federal Rules of Civil Procedure, which appears to subject affidavits in the summary judgment context to a subjective good faith standard. This argument is misdirected, as this Court is not

acting on a clean slate; our task is not to decide what the rule should be, but rather to determine what it is. Once we conclude that Rule 11 speaks to the matter at issue, our inquiry is complete. See *Pavelic & LeFlore, supra,* at 126. As originally drafted, Rule 11 set out a subjective standard, but the Advisory Committee determined that this standard was not working. See *Cooter & Gell,* 496 U. S., at 392–393. Accordingly, the Committee deleted the subjective standard at the same time that it expanded the rule to cover parties. See Wright & Miller § 1335, at 58–60. That the Advisory Committee did not also amend Rule 56(g) hardly matters. Rather than fashion a standard specific to summary judgment proceedings, the Committee chose to amend Rule 11, thereby establishing a more stringent standard for all affidavits and other papers. Even if we were convinced that a subjective bad faith standard would more effectively promote the goals of Rule 11, we would not be free to implement this standard outside of the rulemaking process. "Our task is to apply the text, not to improve upon it." *Pavelic & LeFlore, supra,* at 126.

Nor are we convinced that, as a policy matter, represented parties should not be held to a reasonable inquiry standard. Quite often it is the client, not the attorney, who is better positioned to investigate the facts supporting a paper or pleading. This case is a perfect example. Business Guides brought the matter to Finley, Kumble and requested the law firm to obtain an immediate injunction against Chromatic. Given the apparent urgency, the District Court reasoned that the firm could not be blamed for relying on the factual representations of its experienced corporate client. Rather, the blame—and the sanctions—properly fell on Business Guides:

> "This case illustrates well the dangers of a party's failure to act reasonably in commencing litigation. Here Business Guides, a sophisticated corporate entity, hired a large, powerful and nationally known law firm to file suit against a competitor for copyright infringement.

> This competitor happened to be a one-man company operating out of a garage in California. Two years later, after extensive time and effort on the part of the court, the various counsel for Business Guides, as well as various counsel for Business Guides' counsel, it turns out there was no evidence of infringement. The entire lawsuit was a mistake. In the meantime, the objects of this lawsuit have spent thousands of dollars of attorney's fees and have suffered potentially irreparable damage to their business. This entire scenario could have been avoided if, prior to filing the suit, Business Guides simply had spent an hour, like the court's law clerk did, and checked the accuracy of the purported seeds." 121 F. R. D., at 405.

Where a represented party appends its signature to a document that a reasonable inquiry into the facts would have revealed to be without merit, we see no reason why a district court should be powerless to sanction the party in addition to, or instead of, the attorney. See Wright & Miller § 1336, at 104. A contrary rule would establish a safe harbor such that sanctions could not be imposed where an attorney, pressed to act quickly, reasonably relies on a client's careless misrepresentations.

Of course, represented parties may often be less able to investigate the legal basis for a paper or pleading. But this is not invariably the case. Many corporate clients, for example, have in-house counsel who are fully competent to make the necessary inquiry. Other party litigants may have a great deal of practical litigation experience. Indeed, Business Guides itself is no stranger to the courts; it is a sophisticated corporate entity that has been prosecuting copyright infringement actions since 1948. App. 105–106. The most that can be said is that the legal inquiry that can reasonably be expected from a party may vary from case to case. Put another way, "what is objectively reasonable for a client may differ from what is objectively reasonable for an attorney."

892 F. 2d, at 810. The Advisory Committee was well aware of this when it amended Rule 11. Thus, the certification standard, while "more stringent than the original good-faith formula," is not inflexible. "The standard is one of reasonableness *under the circumstances*" (emphasis added). Advisory Committee's Note to Fed. Rule Civ. Proc. 11, 28 U. S. C. App., p. 576. This formulation "has been embraced in all thirteen circuits." Wright & Miller § 1335, at 61–62. This is a far more sensible rule than that proposed by Business Guides, which would hold parties proceeding *pro se* to an objective standard, while applying a lesser subjective standard to represented parties. As noted by the Court of Appeals: "We fail to see why represented parties should be given the benefit of a subjective bad faith standard whereas pro se litigants, who do not enjoy the aid of counsel, are held to a higher objective standard." 892 F. 2d, at 811.

Giving the text its plain meaning, we hold that it imposes on any party who signs a pleading, motion, or other paper—whether the party's signature is required by the Rule or is provided voluntarily—an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing, and that the applicable standard is one of reasonableness under the circumstances.

### III

One issue remains: Business Guides asserts that imposing sanctions against a represented party that did not act in bad faith violates the Rules Enabling Act, 28 U. S. C. § 2072. The Act authorizes the Court "to prescribe general rules of practice and procedure," but provides that such rules "shall not abridge, enlarge, or modify any substantive right." Business Guides argues that Rule 11, to the extent that it imposes on represented parties an objective standard of reasonableness, exceeds the limits of the Court's power in two ways: (1) It authorizes fee shifting in a manner not approved by Congress; and (2) it effectively creates a federal tort

of malicious prosecution, thereby encroaching upon various state law causes of action.

We begin by noting that any Rules Enabling Act challenge to Rule 11 has a large hurdle to get over. The Federal Rules of Civil Procedure are not enacted by Congress, but "Congress participates in the rulemaking process." Wright & Miller § 1332, at 40, and n. 74, citing Amendments to the Rules of Civil Procedure for the United States District Courts, H. R. Doc. No. 54, 98th Cong., 1st Sess., 3–25 (1983). Additionally, the Rules do not go into effect until Congress has had at least seven months to look them over. See 28 U. S. C. § 2074. A challenge to Rule 11 can therefore succeed "only if the Advisory Committee, this Court, and Congress erred in their prima facie judgment that the Rule . . . transgresses neither the terms of the Enabling Act nor constitutional restrictions." Hanna v. Plumer, 380 U. S. 460, 471 (1965).

This Court's decision in Burlington Northern R. Co. v. Woods, 480 U. S. 1 (1987), presents another hurdle. There, the Court considered the Act's proscription against interference with substantive rights and held, in a unanimous decision, that "Rules which incidentally affect litigants' substantive rights do not violate this provision if reasonably necessary to maintain the integrity of that system of rules." Id., at 5 (emphasis added). There is little doubt that Rule 11 is reasonably necessary to maintain the integrity of the system of federal practice and procedure, and that any effect on substantive rights is incidental. See id., at 8. We held as much only last Term in Cooter & Gell: "It is now clear that the central purpose of Rule 11 is to deter baseless filings in district court and thus, consistent with the Rule Enabling Act's grant of authority, streamline the administration and procedure of the federal courts." 496 U. S., at 393.

Petitioner's challenges do not clear these substantial hurdles. In arguing that the monetary sanctions in this case constitute impermissible fee shifting, Business Guides relies

on the Court's statement in *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240, 247 (1975), that, in the absence of legislative guidance, courts do not have the power "to reallocate the burdens of litigation" by awarding costs to the losing party in a civil rights suit; they have only the power to sanction a party for bad faith. See *id.*, at 258–259. The initial difficulty with this argument is that *Alyeska* dealt with the courts' inherent powers, not the Rules Enabling Act. Rule 11 sanctions do not constitute the kind of fee shifting at issue in *Alyeska*. Rule 11 sanctions are not tied to the outcome of litigation; the relevant inquiry is whether a specific filing was, if not successful, at least well founded. Nor do sanctions shift the entire cost of litigation; they shift only the cost of a discrete event. Finally, the Rule calls only for "an appropriate sanction"—attorney's fees are not mandated. As we explained in *Cooter & Gell:* "Rule 11 is not a fee-shifting statute . . . . 'A movant under Rule 11 has no entitlement to fees or any other sanction.'" 496 U. S., at 409, quoting American Judicature Society, Rule 11 in Transition, The Report of the Third Circuit Task Force on Federal Rule of Civil Procedure 11, p. 49 (Burbank, reporter 1989).

Also without merit is Business Guides' argument that Rule 11 creates a federal common law of malicious prosecution. We rejected a similar claim in *Cooter & Gell*. But see 496 U. S., at 411–412 (STEVENS, J., dissenting). The main objective of the Rule is not to reward parties who are victimized by litigation; it is to deter baseless filings and curb abuses. See *id.*, at 393, 409. Imposing monetary sanctions on parties that violate the Rule may confer a benefit on other litigants, but the Rules Enabling Act is not violated by such incidental effects on substantive rights. See *Woods, supra,* at 5, 8. Additionally, we are confident that district courts will resist the temptation to use sanctions as substitutes for tort damages. This case is a good example. Chromatic asked that the sanctions award include consequential damages, but the District Court refused. "[W]hile sympathetic to [Chro-

matic's] plight," the court was "not persuaded that such compensation is within the purview of Rule 11."  121 F. R. D., at 406.  In the event that a district court misapplies the Rule in a particular case, the error can be corrected on appeal. "But misapplications do not themselves provide a basis for concluding that Rule 11 was the result of . . . distinct errors in prima facie judgment during the development and promulgation of the rule."  Wright & Miller § 1332, at 40.

In sum, we hold today that Rule 11 imposes an objective standard of reasonable inquiry on represented parties who sign papers or pleadings.  We have no occasion to determine whether or under what circumstances a nonsigning party may be sanctioned.  The District Court found that Business Guides failed to conduct a reasonable inquiry before signing the initial TRO application and before submitting the signed declaration of its Director of Research, Michael Lambe. Consequently, the District Court imposed $13,865.66 in sanctions against Business Guides and dismissed the action with prejudice.  The Court of Appeals affirmed each of these rulings.  For the reasons stated herein, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE KENNEDY, with whom JUSTICE MARSHALL and JUSTICE STEVENS join, and with whom JUSTICE SCALIA joins as to Parts I, III, and IV, dissenting.

The purpose of Federal Rule of Civil Procedure 11 is to control the practice of attorneys, or those who act as their own attorneys, in the conduct of litigation in the federal courts.  Extending judicial power far beyond that boundary, the Court, relying only on its rulemaking authority, now holds that citizens who seek the aid of the federal courts may risk money damages or other sanctions if they do not satisfy some objective standard of care in the preparation or litigation of a case.  This holding is an extraordinary departure from settled principles governing liability for misuse of the courts, just as it departs from the structure of the Rule itself.

The result is all the less defensible in that the sanctions will apply quite often to those so uninformed that they sign a paper without necessity. Where the rules or circumstances require a verified complaint or affidavit, the majority's construction of Rule 11 affords no avenue of escape from this most troubling and chilling liability.

In my view, the text of the Rule does not support this extension of federal judicial authority. Under a proper construction of Rule 11, I should think it an abuse of discretion to sanction a represented litigant who acts in good faith but errs as to the facts.

I

Though the case turns upon a single sentence in Rule 11, the majority recognizes that the whole text of the Rule must be considered, not just the sentence in isolation. See *Richards* v. *United States*, 369 U. S. 1, 11 (1962). The majority errs, however, in its interpretation of the text which precedes and the text which follows the sentence in question. And the result is quite contrary to the Rule's history and the commentary that accompanied its adoption. The majority in the last analysis can rely only upon the following sentence from the Rule: "The signature of an attorney or *party* constitutes a certificate by the signer . . . that to the best of the signer's knowledge, information, and belief *formed after reasonable inquiry* it is well grounded in fact. . . ." Fed. Rule Civ. Proc. 11 (emphasis added). From this it reasons: Business Guides is a party; agents of Business Guides signed papers submitted on the company's behalf; therefore, Business Guides assumed a duty of reasonable inquiry.

But Rule 11's fifth sentence must be construed in light of its first two sentences, which provide that "[e]very pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record," and that "[a] party who is not represented by an attorney" shall sign the papers in person. Fed. Rule Civ. Proc. 11. Neither of the first two sentences requires, or even contem-

plates, a signature by a represented party. Nor is a represented party's signature required by any later portion of the Rule. In context, then, one may with reason correlate "[t]he signature of an attorney or party" that constitutes a Rule 11 certification with the signatures of attorneys and *unrepresented parties* provided for earlier in the Rule. We employed just such an analysis last Term in *Pavelic & LeFlore* v. *Marvel Entertainment Group*, 493 U. S. 120, 124 (1989), reasoning that "in a paragraph beginning with a requirement of individual signature, and then proceeding to discuss the import and consequences of signature, . . . references to the signer in the later portions must reasonably be thought to connote the individual signer mentioned at the outset." As we concluded in *Pavelic & LeFlore*, I would again hold the drafters of Rule 11 intended to bind those whose signatures are provided for in the Rule itself. The disjunction between represented parties and those whose signatures are significant for purposes of the Rule is borne out by the Rule's last sentence, which provides for sanctions upon "the person who signed [the paper], a represented party, or both." In my view, this sentence contemplates that the represented party and the person who signs will be different persons.

All would concede the primary purpose of the Rule is to govern those who practice before the courts, and the history of Rule 11's certification requirements illustrates the radical nature of the change wrought by the majority's construction. At least since Sir Thomas More served as Chancellor of England, bills in equity have required the signature of counsel. Risinger, Honesty in Pleading and Its Enforcement: Some "Striking" Problems with Federal Rule of Civil Procedure 11, 61 Minn. L. Rev. 1, 10–12, and n. 22 (1976). Counsel could be required to pay the costs of an aggrieved party if a bill contained "irrelevant, impertinent, or scandalous" matter. J. Story, Equity Pleadings § 47, pp. 41–42 (1838). Justice Story explained that the purpose of the required signature was "to secure regularity, relevancy and decency in the alle-

gations of the Bill, and the responsibility and guaranty of counsel, that upon the instructions given to him, and the case laid before him, there is good ground for the suit in the manner in which it is framed." See Risinger, *supra*, at 9–13. Justice Story's explanation for counsel's signature was incorporated into Rule XXIV of the Equity Rules of 1842,[1] and the certification requirements were expanded in Rule 24 of the 1912 Equity Rules.[2] See Risinger, *supra*, at 13. Rule 11, adopted in 1938, extended the signature requirement beyond attorneys to encompass unrepresented parties as well.[3]

---

[1] "Every bill shall contain the signature of counsel annexed to it, which shall be considered as an affirmation on his part, that upon the instructions given to him and the case laid before him, there is good ground for the suit, in the manner in which it is framed." Rules of Practice for the Courts of Equity of the United States, 1 How. xxxix, xlviii (1842).

[2] "Every bill or other pleading shall be signed individually by one or more solicitors of record, and such signatures shall be considered as a certificate by each solicitor that he has read the pleading so signed by him; that upon the instructions laid before him regarding the case there is good ground for the same; that no scandalous matter is inserted in the pleading; and that it is not interposed for delay." Rules of Practice for the Courts of Equity of the United States, 226 U. S. 627, 655 (1912).

[3] Prior to 1983, Rule 11 read:

"Every pleading of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading and state his address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The rule in equity that the averments of an answer under oath must be overcome by the testimony of two witnesses or of one witness sustained by corroborating circumstances is abolished. The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay. If a pleading is not signed or is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false and the action may proceed as though the pleading had not been served. For a wilfull violation of this rule an attorney may be subjected to appropriate disciplinary action. Similarly action may be taken if scandalous or indecent matter is inserted." Fed. Rule Civ. Proc. 11, 28 U. S. C. App. (1982 ed.).

But it did not apply the certification requirements to unrepresented parties until 1983.

The 1983 amendments made substantial changes in Rule 11, expanding the duties imposed by the certification provisions, extending the certification requirements to unrepresented parties, and establishing that sanctions could, at least in some circumstances, be imposed on represented parties. But in light of the history of Rule 11's certification provisions as a set of duties imposed on counsel, I see no reason to believe that the Rule as amended attaches any particular significance to the signature of a represented party. It is more plausible that the language relied upon by the majority was designed to bring the signatures of unrepresented parties, already required by the Rule, within the certification provisions. This ensures that every pleading, motion, or other paper filed in federal court bears at least one signature constituting a Rule 11 certification. Applying the certification requirements to those who appear on their own behalf preserves the Rule's well-understood object of imposing obligations on those who practice before the court. A *pro se* litigant in essence stands in the place of an attorney. By its uncritical extension of the Rule's certification provisions to represented parties, the majority's reading severs the certification requirements from their purpose and origin.

If the drafters of the 1983 amendments had intended a radical departure from prior practice by imposing duties on represented parties that before had been imposed only on attorneys, one might expect discussion of the change in the Advisory Committee's Notes accompanying the 1983 amendments. But the Notes say nothing of the kind. They refer instead to "the standard of conduct expected of *attorneys* who sign pleadings and motions," or the "expanded nature of the *lawyer's* certification," or employ similar phrases indicating that the Rule's certification duties relate to attorneys and those who perform the functions of attorneys. Advisory Committee's Notes on Fed. Rule Civ. Proc. 11, 28 U. S. C.

App., pp. 575–576 (emphasis added).[4]   In fact, the Notes imply that Rule 11 certification requirements were not intended to attach to the signature of a represented party, and that a represented party may be held liable for sanctions only when his attorney has signed a paper in violation of the Rule. For instance, the Notes provide:

> "If the duty imposed by the rule is violated, the court should have the discretion to impose sanctions on either the attorney, *the party the signing attorney represents,* or both, or on an unrepresented party who signed the pleading, and the new rule so provides."   *Id.*, at 576 (emphasis added).

The failure to mention the signature of a represented party is a startling omission if such a signature could violate the Rule. The assumption of this passage, that a represented party can be sanctioned in some instances because his attorney signed in violation of the Rule, not because the party did, finds further support in the next paragraph of the Notes.   It begins, *"Even though it is the attorney whose signature violates the rule*, it may be appropriate under the circumstances of the case to impose a sanction on the client."   *Ibid.* (emphasis added).

Consider as well the portion of the Notes indicating that "[a]mended Rule 11 *continues* to apply to anyone who signs a pleading, motion, or other paper."   *Ibid.* (emphasis added). Since Rule 11 did not impose any duties on a represented party who signed papers prior to 1983, it is difficult to fathom what this passage means if the 1983 amendments had the effect attributed to them by the majority.   The passage makes sense only if it means that Rule 11 continues to apply to anyone whose signature is provided for in the Rule itself.

---

[4] See Advisory Committee's Notes on Fed. Rule Civ. Proc. 11, 28 U. S. C. App., p. 575 ("The new language is intended to reduce the reluctance of courts to impose sanctions by emphasizing the responsibilities of the *attorney* and reenforcing those obligations by the imposition of sanctions") (emphasis added; citation omitted).

With little support for its views in the text of Rule 11 or the Advisory Committee's Notes, the majority turns to the works of scholars. Even here, though, the passages quoted from the treatise authored by Professors Wright and Miller do not seem to me unambiguous endorsements of the majority's position. They speak of Rule 11's expansion to "'all signers, not just attorneys'" or "'non-attorney signers.'" *Ante*, at 545–546 (quoting 5A C. Wright & A. Miller, Federal Practice and Procedure § 1331, pp. 21–22, and n. 54 (2d ed. 1990)). But "signer" is a term of art in Rule 11, and under a proper interpretation it applies to those whose signatures the Rule itself requires. In any event, these snippets from a multivolume treatise do not reflect studied consideration of the precise question before the Court, whether a represented party's signature comes within the Rule 11 certification requirements. The only explicit reference I find in that treatise to the signature of a represented party is the statement that such signatures are "unnecessary, but not improper." 5A Wright & Miller, *supra*, § 1333, at 47. This falls far short of the majority's position.

The majority's construction can draw scant support from the deterrent policies of Rule 11. See *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 393 (1990) ("[A]ny interpretation [of Rule 11] must give effect to the Rule's central goal of deterrence"). Since the Rule does not require represented parties to sign pleadings, motions, or other papers, the certification requirements will apply in many instances to a represented party who signs a paper as a volunteer. Given the majority's holding, enlistees will be few and far between. It can be supposed that after today's decision, most represented parties who sign papers without necessity will do so unaware that they subject themselves to the risk of sanctions. If so, their conduct will not be affected by the duties assumed. If the Rule 11 certification requirements were intended to apply to represented parties, its provisions would require them to sign papers covered by the Rule, not leave it as an option. I

can imagine no plausible reason for leaving it to the discretion of a represented party whether to assume Rule 11 certification duties and the concomitant risk of sanctions. The majority's suggestion that a represented party's signature might induce a court to give greater credence to a submitted paper, *ante*, at 546, provides little justification for construing Rule 11 to become a trap for the unwary. Rule 11 already requires a represented party's attorney to sign, and few courts will be swayed by the fact that a pleading bears two Rule 11 signatures rather than one.

The majority errs in suggesting that Rule 11's third sentence, coupled with Rule 65(b), "required" the signature of Business Guides. *Ante*, at 543. Rule 65(b) requires that applications for temporary restraining orders be verified *or supported by affidavit.* Since, as I explain, *infra*, at 562, affidavits are not "papers" within the meaning of the Rule and are often signed by individual witnesses and not parties, the Rules did not require Business Guides to sign here.

Moreover, the majority's suggestion that Rule 11's third sentence "require[s]," *ante*, at 543, or "provide[s] for," *ante*, at 544, signatures by represented parties ignores the evident fact that this sentence abolishes any verification or affidavit requirement "[e]xcept when otherwise specifi- cally provided by rule or statute." Of course, the sentence in question recognizes that certain rules and statutes, such as Rule 65(b), still provide for complaints verified by parties or accompanied by affidavits. See, *e. g.*, Fed. Rule Civ. Proc. 23.1 (shareholder derivative suit); Fed. Rule Civ. Proc. 27(a)(1) (perpetuation of testimony); Fed. Rule Civ. Proc. 65(b) (*ex parte* request for temporary restraining order); 28 U. S. C. § 1734(b) (application for order establishing lost or destroyed record); § 2242 (application for writ of habeas corpus); see generally 5A Wright & Miller, *supra*, § 1339. It is not plausible to argue that Rule 11 seeks to bring those documents within its ambit, however, for this portion of the Rule existed prior to 1983, when represented

parties were mentioned for the first time. Wrongful verification already subjects one to potential prosecution for perjury, 18 U. S. C. §§ 1621, 1623, and it is not clear why Rule 11 would impose additional duties on represented parties in those few instances where verification is necessary. Further, if the drafters of Rule 11 had intended to subject a verifying party to the duties imposed on a Rule 11 signer, a plain statement to that effect in the text of the Rule would have accomplished that result without the odd consequences of the majority's analysis.

The majority's holding that affidavits are included among the "pleadings, motions, or other papers" covered by Rule 11 will doubtless be the portion of its opinion having the greatest impact, and will come as a surprise to many members of the bar. An affidavit submitted in support of a represented party's position will now have to be signed by at least one attorney, or else must be stricken pursuant to Rule 11's sixth sentence. I would construe the "papers" covered by Rule 11 to be those which, like pleadings or motions, invoke the power of the court, as distinct from supporting affidavits alleging factual matters as in this case or under Federal Rule of Civil Procedure 56. Pursuant to Rule 11, one who signs a paper certifies that it "is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." Since it would be meaningless to make such a certification with respect to an evidentiary document, I do not believe affidavits come within the intended scope of the Rule. As the majority all but admits, *ante*, at 549, its holding renders superfluous Rule 56(g), which imposes sanctions for summary judgment affidavits submitted in bad faith, since any affidavit submitted in bad faith will also fail the Rule 11 certification standards.

Though it seems unnecessary to the proper resolution of the case, I feel compelled to point out one further difficulty with the majority's analysis. The majority reasons that Business Guides here incurs liability under the portion of the

Rule's last sentence permitting a court to sanction "the person who signed" a pleading. But the majority's conclusion is in square conflict with our interpretation of that phrase last Term in *Pavelic & LeFlore*, 493 U. S. 120 (1989). There we construed the authority to sanction "the person who signed" to extend only to an individual attorney and not to the firm on whose behalf he signed. Though a law firm cannot be a "person who signed," the majority now says that a corporation may. But the gist of our rationale in *Pavelic & LeFlore* was that the duties imposed by Rule 11's certification requirements attach to an *individual* signer, rather than an entity the signer represents. We said: "It is as strange to think that the phrase 'person who signed' in the last sentence refers to the partnership represented by the signing attorney, as it would be to think that the earlier phrase 'the signer has read the pleading' refers to a reading not necessarily by the individual signer but by someone in the partnership." *Id.*, at 124. It is just as strange, I submit, to assert that here a corporation is the "person who signed," and that the corporation thereby represented that it "ha[d] read the pleading."

In *Pavelic & LeFlore*, moreover, we rejected an appeal to "'long and firmly established legal principles of partnership and agency'":

> "We are not dealing here . . . with common-law liability, but with a Rule that strikingly departs from normal common-law assumptions such as that of delegability. The signing attorney cannot leave it to some trusted subordinate, or to one of his partners, to satisfy himself that the filed paper is factually and legally responsible; by signing he represents not merely the fact that it is so, but also the fact that he personally has applied his own judgment." *Id.*, at 125.

The majority seeks now to resurrect the same principles of agency we put to rest last Term. The president of Business Guides and other employees signed papers submitted in support of the company's position, and the Court holds the com-

pany assumed a duty, perhaps delegable to other agents, to comply with the Rule 11 certification requirements. Either the Court was wrong last Term or it is wrong now. The duties imposed by Rule 11 either apply to corporate entities or they do not. The better resolution would be to hold that the signatures of represented parties, including corporations and partnerships, have no significance for Rule 11 purposes.

## II

Applied to attorneys, Rule 11's requirement of reasonable inquiry can be justified as within the traditional power of the courts to set standards for the bar. Our decisions recognize the "disciplinary powers which English and American courts (the former primarily through the Inns of Court) have for centuries possessed over members of the bar, incident to their broader responsibility for keeping the administration of justice and the standards of professional conduct unsullied." *Cohen* v. *Hurley*, 366 U. S. 117, 123–124 (1961). An attorney acts not only as a client's representative, but also as an officer of the court, and has a duty to serve both masters. Likewise, applying this duty of reasonable inquiry to *pro se* litigants, as amended Rule 11 does, can be viewed as a corollary to the courts' power to control the conduct of attorneys. Requiring *pro se* litigants to make the Rule 11 certification ensures that, in each case, at least one person has taken responsibility for inquiry into the relevant facts and law.

But it is a long step from this traditional judicial role to impose on a represented party the duty of reasonable inquiry prior to the filing of a lawsuit, measured by an objective standard applied in hindsight by a federal judge. Until now, it had never been supposed that citizens at large are, or ought to be, aware of the contents of the Federal Rules of Civil Procedure, or that those Rules impose on them primary obligations for their conduct. This new remedy far exceeds any previous authority of a federal court to sanction a represented party. The rules we prescribe have a statutory au-

thorization and need not always track the inherent authority of the federal courts. See *Sibbach* v. *Wilson & Co.*, 312 U. S. 1 (1941). At the same time, the further our rules depart from our traditional practices, the more troubling becomes the question of our rulemaking authority.

In the Rules Enabling Act, Congress has delegated to this Court authority to prescribe "general rules of practice and procedure," 28 U. S. C. § 2072(a), which may not "abridge, enlarge or modify any substantive right," § 2072(b). The grant of authority to regulate procedure and the denial of authority to alter substantive rights expresses proper concern for federalism and separation of powers. See 19 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4509 (1982). Congress desired the courts to regulate "practice and procedure," an area where we have expertise and some degree of inherent authority. But Congress wanted the definition of substantive rights left to itself in cases where federal law applies, or to the States where state substantive law governs.

In my view, the majority's reading of Rule 11 raises troubling concerns with respect to both separation of powers and federalism. At the federal level, the new duty discovered by the majority in the text of the Rule is one that should be created, if at all, by Congress. In *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240 (1975), while confirming the authority of the courts to award attorney's fees against a party conducting vexatious or bad-faith litigation, we reversed an award of attorney's fees made on the theory that the prevailing party had acted as a "private attorney general." We reaffirmed the American Rule that litigants in most circumstances must bear their own costs, and noted that Congress had itself provided for fee awards under various statutes when it thought fee shifting necessary to encourage certain types of claims. We held that "it [was] not for us to invade the legislature's province by redistributing litigation costs in the manner" proposed in that case. *Id.*, at 271.

As interpreted by the majority, Rule 11 "redistribut[es] litigation costs" much like the fee-shifting theory rejected in *Alyeska Pipeline*. The majority's distinction between an "appropriate sanction" under Rule 11 based on a "discrete event" and the fee shifting at issue in *Alyeska Pipeline*, *ante*, at 553, breaks down in a case like this one where the "discrete event" was the filing of the lawsuit and the "appropriate sanction" was the payment of respondents' attorney's fees coupled with dismissal of the suit. Any mechanism for redistributing costs, even the inherent sanctioning authority of the federal courts, has the potential to affect decisions concerning whether and where to file suit. But the risk of deterring a meritorious suit is slight where sanctions are only available for bad-faith or frivolous claims. On the other hand, when a party's prefiling conduct is subject to evaluation for objective reasonableness by the court, the risk of filing suit changes and there arises a real risk of deterring meritorious claims. Under the majority's holding in this case, the deterrent effect will arise most often where the rules require verification of complaints. See *supra*, at 562. In particular, one may expect reticence to seek temporary restraining orders since the time pressures inherent in such situations create an acute risk of sanctions for unreasonable prefiling inquiry.

The majority does not tell us what standard it thinks should be applied in deciding whether to sanction a represented party who has not signed a Rule 11 paper. *Ante*, at 554. The chilling impact of the majority's negligence standard will be much greater if the majority applies it in that circumstance as well. This result seems a plausible consequence of the majority's reasoning. See *ante*, at 549–550. It is not the business of this Court to prescribe rules "redistributing litigation costs" in a manner that discourages good-faith attempts to vindicate rights granted by the substantive law. *Kaiser Aluminum & Chemical Corp.* v. *Bonjorno*, 494

U. S. 827, 835 (1990) ("[T]he allocation of the costs accruing from litigation is a matter for the legislature, not the courts").

Our potential incursion into matters reserved to the States also counsels against adoption of the majority's rule. Just as the various statutory fee-shifting mechanisms reflect policy choices by Congress regarding the extent to which certain types of litigation should be encouraged or discouraged, state tort law reflects comparable state policies. As interpreted by the majority, Rule 11 places on those represented parties who sign papers subject to the Rule duties far exceeding those imposed by state tort law. In general, States permitting recovery for malicious prosecution or abuse of process require the plaintiff to prove malice or improper purpose as a necessary element. W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts §§ 120–121 (5th ed. 1984); 1 F. Harper, F. James, & O. Gray, The Law of Torts § 4.8 (2d ed. 1986); Restatement (Second) of Torts § 676 (1977). As interpreted by the majority, Rule 11 creates a new tort of "negligent prosecution" or "accidental abuse of process," applicable to any represented party ignorant enough to sign a pleading or other Rule 11 paper. Cf. Response to a Practitioner's Commentary on the Actual Use of Amended Rule 11, 54 Ford. L. Rev. 28, 29–30 (1985) (remarks of Judge Charles Sifton); Brief for Petitioner 40.

In this case, the District Court imposed sanctions on a corporation for the actions of its agents taken in reliance on business records developed to safeguard the company's property rights in its own research. The decision to impose sanctions required the court, sitting without a jury, to make judgments about the skill and care that companies of this kind must use in their business practices. We tolerate judgments about the care an attorney must use because we deem judges to know the standards appropriate for the practice of law. We do not have similar expertise in the workings of private enterprise or the conduct and supervision of investigations made by a company to protect and defend its rights. And

though the majority would seem to suggest it, I should not have thought that before a person or entity seeks the aid of the federal courts, it ought to know the contents of the Federal Rules of Civil Procedure, rules that, at least until now, were the domain of lawyers and not the community as a whole.

A rule sanctioning misconduct during the litigation process will often satisfy the Rules Enabling Act because it "affects only the process of enforcing litigants' rights and not the rights themselves." *Burlington Northern R. Co.* v. *Woods*, 480 U. S. 1, 8 (1987). As applied to attorneys, and perhaps those who act as their own attorneys, the same can be said of Rule 11's sanctions for failure to conduct a reasonable pre-filing inquiry. That much we established in *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S., at 393. See *ante*, at 552. But the presumption that a Federal Rule is valid carries less weight in a case such as this, where "the intended scope of [the] Rule is uncertain," 19 Wright, Miller, & Cooper, at 147–148, and the construction of Rule 11 adopted today extends our role far beyond its traditional and accepted boundaries. Whether or not Rule 11 as construed by the majority exceeds our rulemaking authority, these concerns weigh in favor of a reasonable, alternative interpretation, one which, as I said at the outset, is more consistent with the text of the Rule. See *Cooter & Gell, supra,* at 391 ("We . . . interpret Rule 11 according to its plain meaning, . . . in light of the scope of the congressional authorization [in the Rules Enabling Act]"); 19 Wright, Miller, & Cooper, at 148 ("If a federal court concludes it is uncertain whether a Civil Rule truly governs a given question of practice, and if a relevant state rule of law differs, the extent to which application of the Civil Rule would interfere with substantive rights is certainly one of the factors that should be considered in deciding whether the Civil Rule applies. In effect, the 'substantive rights'

limitation, and the concern it reflects for the integrity of state substantive policies, is relevant to determining the scope of the Civil Rules").

## III

Under my analysis, an attorney must violate Rule 11 before a represented party can be sanctioned. Regardless of the standard of conduct applicable to represented parties, I would reverse because it has not been shown on this record that an attorney signed a paper in violation of the Rule. A Finley, Kumble attorney did sign the original complaint and application for a temporary restraining order. However, the District Court did not find that Finley, Kumble lawyers had violated the Rule at the time the complaint was submitted.

The District Court did conclude that Finley, Kumble attorneys failed to conduct a reasonable inquiry prior to submission of the Lambe declaration. The Lambe declaration was not itself signed by an attorney, however, and, under my analysis of the Rule, could not serve as a basis for sanctions. See also *supra*, at 562. Indeed, Mr. Lambe's signature was not even the signature of a party. Certainly, a corporation only acts through its agents; that does not mean that all actions by a corporation's agents are actions on behalf of the corporation. Unlike the signature of the company's president verifying the complaint, Mr. Lambe's signature was on his own behalf, and did not in any way purport to bind the corporation.

I doubt that the papers submitted to the court with the Lambe declaration violate Rule 11. The only action these documents requested of the court was that it accept the Lambe declaration under seal and review it *in camera*. The relief requested was in no sense dependent on the accuracy of the representations made by Lambe. Given the purpose of these documents, they were well supported by fact and existing law, and an attorney's signature on these papers

would not seem to me a violation of Rule 11 certification requirements.[5]

Even were I to find an attorney violation, I would view it as an abuse of discretion to sanction a represented party if the party has acted in good faith. I recognize that an objective standard does, and should, govern the conduct of the attorney. With respect to a represented party, though, I would reverse the decision below for having applied a standard of objective reasonableness rather than some subjective bad-faith standard.

## IV

Just as patience is requisite in the temperament of the individual judge, so it must be an attribute of the judicial system as a whole. Our annoyance at spurious and frivolous claims, and our real concern with burdened dockets, must not drive us to adopt interpretations of the rules that make honest claimants fear to petition the courts. We may be justified in imposing penalties on attorneys for negligence or mistakes in good faith; but it is quite a different matter, and the exercise of a much greater and more questionable authority, for us to impose that primary liability on citizens in general. These concerns underscore my objections to the majority's holding. With respect, I dissent.

---

[5] It might be argued that the attorney's signature on the original filings created a continuing duty to conduct reasonable inquiry and to amend or withdraw the pleadings as new facts came to light. Compare *Thomas* v. *Capital Security Serv., Inc.*, 836 F. 2d 866 (CA5 1988) (en banc), with *Herron* v. *Jupiter Transp. Co.*, 858 F. 2d 332, 335–336 (CA6 1988). See Burbank, The Transformation of American Civil Procedure: The Example of Rule 11, 137 U. Pa. L. Rev. 1925, 1930, n. 27 (1989). However, I would be unwilling to adopt such a construction of the Rule in a case such as this, where the issue has not been briefed.